## STATE OF MINNESOTA v. FEDERAL RESERVE BANK OF MINNEAPOLIS.

### No. 2967.

District Court, D. Minnesota.
Fourth Division.
June 14, 1938.

Frank J. Williams, Asst. Co. Atty., of Hennepin County, of Minneapolis, Minn., for plaintiff.

Ueland & Ueland, of Minneapolis, Minn., for defendant.

NORDBYE, District Judge.

The Federal Reserve Bank of Minneapolis is the central bank of the Ninth Reserve District, which includes Minnesota, North and South Dakota, Montana, and a part of northern Wisconsin and northern Michigan. The bank building in Minneapolis was completed in 1924 at the following cost: Building, $2,940,711.39; land, $600,520.66; total, $3,541,232.05. Since that time, and up to and including May 1, 1936, some $5,517.60 has been expended for a protective system.

The real estate upon which is situated the banking house of the defendant was

valued by the taxing authorities at $470,250 and the building and improvements at $1,300,000, or a total of $1,770,250 as its full and true value. The defendant contends that the full and true value in money of the real estate, including land, building, and improvements thereon as of May 1, 1936, or any time during that year, did not exceed the sum of $470,250, and that the building and improvements added nothing whatever to the market value of the real estate. It is contended that the city assessor and taxing authorities have not valued the real estate in accordance with its true and full value at the price which could have been obtained for the same at private sale, but that some arbitrary rule has been followed in obtaining the assessed valuation contrary to the mandate of the statute. The pertinent statutes of the state are as follows:

"1977. Real property, for the purposes of taxation shall be construed to include the land itself, and all buildings, structures, and improvements or other fixtures of whatsoever kind thereon, and all rights and privileges thereto belonging or in any wise appertaining, and all mines, minerals, quarries, fossils, and trees on or under the same."

"1980. * * * 5. 'True and full value' shall mean the usual selling price at the place where the property to which the term is applied shall be at the time of assessment; being the price which could be obtained therefor at private sale, and not at forced or auction sale."

"1992. All property shall be assessed at its true and full value in money. In determining such value, the assessor shall not adopt a lower or different standard of value because the same is to serve as a basis of taxation, nor shall he adopt as a criterion of value the price for which the said property would sell at auction or at a forced sale, or in the aggregate with all the property in the town or district; but he shall value each article or description of property by itself, and at such sum or price as he believes the same to be fairly worth in money. In assessing any tract or lot of real property, the value of the land exclusive of structures and improvements shall be determined, and also the value of all structures and improvements thereon, and the aggregate value of the property, including all structures and improvements, excluding the value of crops growing upon cultivated land. * * *"

"1992-1. It shall be the duty of every assessor and board, in determining the value of lands for the purpose of taxation and in fixing the assessed value thereof, to consider and give due weight to every element and factor affecting the market value thereof, including its location with reference to roads and streets and the location of roads and streets thereon or over the same, and to take into consideration a reduction in the acreage of each tract or lot sufficient to cover the amount of land actually used for any improved public highway and the reduction in area of land caused thereby. * * *"

Section 2120 was amended in 1902 (Chapter 2, § 18, Laws 1902, Ex.Sess.) and gives the taxpayer a defense if his "parcel has been assessed and taxed at a valuation greater than its real and actual value * *."

Chapter 237, Laws 1935, provides: "It shall be the duty of every assessor and board in determining the value of lands for the purpose of taxation and in fixing the assessed value thereof, to consider and give due weight to lands which are comparable in character, quality and location, to the end that all lands similarly located and improved will be assessed upon a uniform basis and without discrimination."

Since the completion of the building, the record of the assessments has been as follows (those agreed or stipulated to by the parties are indicated in the last column):

| Year | Land | Building | Total | By Stipulation and Agreement |
|---|---|---|---|---|
| 1926 | $627,900 | $2,217,500 | $2,845,400 | |
| 1927 | | | | $2,500,000 |
| 1928 | 627,900 | 2,217,500 | 2,845,400 | 2,400,000 |
| 1930 | 647,490 | 2,217,500 | 2,864,990 | 2,250,000 |
| 1932 | 633,000 | 1,517,000 | 2,150,000 | 2,150,000 |
| 1934 | 547,500 | 1,502,500 | 2,050,000 | 2,050,000 |
| 1936 | 470,250 | 1,300,000 | 1,770,250 | |

It is not contended by the State that the Bank is estopped by the prior assessments or the acquiescence in or agreement as to the value, but it is asserted that the past record of assessments, in view of all the circumstances, has some probative value in the determination of the question presented. The Bank's position is briefly this: The statute requires the assessor to determine the value of property for taxation purposes at its fair market value. It is contended that the test to be applied is

the determination of the sum that the property could have been sold for at private sale. Defendant urges that the four principal elements to be considered in determining the fair sale value are (1) demand for this type of building; (2) earning capacity of the building in the hands of others than the present owners; (3) utility of this type of building to possible purchasers; (4) location. It is recognized by the Bank that other factors may be properly considered in determining market value, but it asserts that the above factors are the most important. The defendant also asserts that the property was unfairly, inequitably, and partially assessed.

The Bank produced four real estate experts who gave as their opinion of the value of the real estate and the building as of the time in question the following figures: $575,000; $675,000; $700,000; and $680,000 to $750,000. There is no particular controversy over the assessed valuation of the land at $470,250. In arriving at the values, these experts ignored the present use or occupancy, assumed the building vacant and estimated the annual rental that might be obtained for some presumed use. In carrying out this formula for determining market value, the annual rents were capitalized, and on this computation, the above market values were obtained. The experts emphasized that the bank building was unsuitable for most business purposes and that there was considerable waste space even in its present use. It was asserted that the cost of maintenance as a business property would be excessive, and the building was described as a fortress-like structure of doubtful architectural attractiveness and of questionable utilitarian value for business purposes. It was contended that it would have but few uses as a business property, and that, as constructed, a commercial bank would find it difficult to make adequate use of the space therein. One of the present officers of the Bank stated that, in his opinion, the building was not effectively or conveniently constructed for its present use and that it was only of salvage value. It appears that the building was about twelve years old at the time the assessment was made. It may be gathered that it was intended and designed to house the Federal Reserve Bank for the Ninth District for many years to come. The primary object in designing and constructing the building was to erect a structure that would safely preserve the funds and securities in the care of the defendant in the event of fire, burglary, or mob attack. The architecture is unique and distinctive, if not pleasing. However, a comparison of the outside appearance of the other Federal Reserve Bank buildings in the United States would indicate that the Minneapolis structure does not compare unfavorably with some of the other buildings. It is apparently recognized by both parties that the building is well-located in the heart of the financial district of this city.

The only factors that are given any real consideration by the defendant's experts are the uses to which the building could be put if the Federal Reserve Bank moved out, and the rental that could probably be obtained if the building were utilized for other purposes. No consideration is given by the experts to the past or prospective earnings of the Bank in this structure. Assuming the land to be worth approximately $470,250, it would appear that these experts have reduced the value of this building for taxation purposes to sums ranging from $105,000 to $280,000. The State's experts limited themselves to a determination of the reproduction cost, less depreciation, as determining the fair cash value. They contend that the bank building may be properly designated as a service building and that this means of determining the true value is the only feasible, equitable and practical method. One estimated the market value of the bank building and ground to be $1,794,974, and the other, $1,958,264.

The assessor testified that, among other things, he took the following factors into consideration in determining the true value: Location; size and shape of the lot; character of surroundings; cost of land; value of land; cost of building; reproduction cost of building, physical value of property; economic life of building; service character of building; previous assessments; previous agreements relative to assessments; character and permanency of occupancy; transportation; and sales and leases of property in the neighborhood. In substantiation of his estimate of the true market value, as contemplated by the statute, he figured the reproduction cost of the building as of May 1, 1936, to be $2,600,000. He allowed 25% depreciation, being approximately 2% per year for the life of the building, and by reason of the apparent difference of opinion as to the effect of the distinctive architecture on its market

value, both artistically and as a utilitarian structure, he allowed an additional 25% for depreciation. Therefore, a total of 50% depreciation is to be found in the assessor's computation.

There has been no appreciable market for downtown real estate in Minneapolis for some years. The principle of supply and demand, which is generally conceded to be the most important criterion in determining market value, is undoubtedly difficult to apply in determining the true value for taxation purposes. Manifestly, a rigid standard which usually serves the purpose when property moves freely in commerce is of but doubtful value in the present times as a guide for the assessor. The fact that there is no demand for downtown property, or that the supply far exceeds the demand, may, if a literal application of the statute is applied, justify such fluctuations in assessment figures from year to year that will precipitate the fiscal affairs of the city into utter confusion. The purpose of an assessment is to distribute the tax burden fairly and equitably. This burden is present in boom times as well as in depressions. As long as real estate bears the major part of that burden, a tax base that will prevent undue discrimination or inequities must be adhered to.

Concededly, it may be difficult at this time, if not impossible, to obtain any buyer who would be willing to pay $1,770,250 (the assessed valuation) for the Federal Reserve Bank building. The number of buyers who would be interested in this type of building for any purpose would be exceedingly few. Obviously, it is in the nature of a semi-public structure, erected for a special use. It was not intended for general business purposes, and when it was constructed it was assumed that its use would be limited to the needs of the Federal Reserve Bank in the Ninth District for many years in the future. If placed upon the market at this time and the United States, for instance, was interested in obtaining a building suitable for a sub-treasury or similar purpose, it may be that a sum approximating its value could be realized out of such a sale, but, because the building may have no market value by reason of no demand, it should not escape its just share of the tax burden. Probably no other downtown building in Minneapolis could be sold at this time for the valuation placed thereon for taxation purposes, but, notwithstanding, the assessor must determine to the best of his judgment from all the factors present the true value of such property.

In State v. Penn Mutual Life Ins. Co., 1936, 198 Minn. 115, 117, 269 N.W. 37, 38, the Supreme Court of this state indicated its attitude in the application of the statutes governing the valuation of real estate for tax purposes during depression periods, stating: "But where there has been a long-continued financial depression which has so affected real estate that no sales or dealings in real estate have taken place, in the vicinity of the lot or parcel of land to be valued for assessment purposes, it is almost impossible to ascertain the market or sales value thereof. When property does not move, whether from want of willing sellers or willing buyers, its sales value in money must necessarily become much a matter of judgment based upon many factors, whose weight may not influence alike the minds of persons qualified to judge. The one upon whom the duty eventually falls to determine such value must fix it 'at such sum or price as he believes the same to be fairly worth in money.' When the court finds the value of real estate in a delinquent tax proceeding, such finding must be based upon the testimony adduced at the trial. It is not for this court to overthrow the finding of value of the trial court unless manifestly against the weight of the evidence."

And on page 119, 269 N.W. on page 39:

"* * * Although there are no sales to establish market value of lands, they must be assessed. As said in State v. Fritch, 175 Minn. 478 [479], 221 N.W. 725, 726:

" 'Taxes have to be levied, and to that end assessors must make valuation of real estate every two years regardless of whether any of the lands could or could not then be sold. * * * Where there have been no actual sales for a long period of time, there is no way of determining values except by the judgment and opinion of men acquainted with the lands, their adaptability for use, and the circumstances of the surrounding community. The trial court could also take into account the qualification of the witnesses and their attitude toward the litigants.' "

It may be noted that the reproduction cost of the building in the financial statement of the Federal Reserve Board and the defendant bank is indicated in peti-

tioner's Exhibit E. This exhibit may be summarized as follows:

Actual cost of land........................ $ 600,520.66
Building, average of 1915 to 1925 costs.... 2,416,745.84
Fixed machinery and equipment........ 532,635.15
                                         ─────────────
    Total Cost ........................... $3,549,901.65
Deduction for equipment sold, not re-
    placed .................................. 3,969.00
                                         ─────────────
    Net Cost ............................. $3,545,932.65
Arbitrarily charged off from building
    value 1919 to 1927....................... 1,133,464.34
                                         ─────────────
Leaving gross book value of............ $2,412,468.31

This gross book value is made up as follows:

Land .................................... $ 500,520.66
Building ................................... 1,283,281.50
Fixed machinery and equipment........ 628,666.15

It appears that the building was depreciated 2% annually on this gross book value in the total sum of $307,987.56, which includes $25,665.63 for the year 1936, leaving a net building value of $975,293.94. The machinery and equipment were depreciated 10% annually, or a total of $621,967.03, leaving a net book value of $6,699.12. The real estate is carried at $500,520.66. After allowing depreciation, the aggregate net book value of these items as of January 1, 1936, is $1,482,513.72. The contractor who built the building, a witness for the State, contradicts the figures of depreciation with reference to machinery and equipment, and contends that 10% per year is entirely too high. He figures the reproduction cost and, estimates such cost as of May 1, 1936, to be $520,810.31, and after allowing what he considers a reasonable twelve year depreciation, he arrives at the figure of $210,184.19 as the true and sound value of the machinery and equipment as of May 1, 1936. Assuming that the contractor's method of figuring depreciation is reasonable and sound, it will be observed that if one adds the difference between the Bank's value and the contractor's value of the machinery and equipment to the net book value, the value of the land and the building would be $1,685,998.79. This figure is fairly comparable to the taxable valuation at which the assessor placed the property.

In attempting to set aside the assessor's valuation, defendant relies solely upon a valuation computed by the capitalization of estimated income. No consideration is given to the other factors which may bear upon the market value.

The building when erected was not primarily constructed to return income as such. It is a single purpose building, and many of its features which may detract from its usefulness as an income producing building may materially enhance its value for the purpose for which it was built, and which purpose and use will probably continue for years to come. Demand for the use is only one factor. To rely entirely on the capitalization of income under these circumstances in determining the market value neglects considerations that are vital. If plaintiff's figures were adopted, there would result a discrimination and a relative injustice in tax valuation that could not be supported and which would run counter to Chapter 237, Laws 1935. Defendant cannot escape its just share of the tax burden by erecting a building which is fairly adequate for its needs and which is devoted and intended to be devoted for its particular purpose for many years in the future, and then contend that, because it is only adapted for its requirements as a semi-public institution, it has no market value except as reflected in the capitalization of income for a use which is non-existent and which was never intended. There may be instances where capitalization of income will fairly reflect taxable values, but there is no intimation in the statute that this method is the exclusive standard to apply. Quite the contrary appears. The assessor is required to give due weight to "every element and factor affecting the market value thereof." Certainly, for taxation purposes, reproduction cost less depreciation is a factor that must be accorded due consideration in a building of this type. Prior assessments, book value as reflected in defendant's public statements, the particular use to which the building is being devoted by the defendant, original cost less depreciation, values of comparable buildings, are all factors which are entitled to due weight. None of these items have been given adequate consideration by defendant's experts.

The State urges that, not only do the assessor's figures fairly represent the true and full value of the property, but that the 1935 amendment (Chapter 237) intended to limit the defense in tax cases to a relative basis, rather than on the independent basis that a particular piece of property had been assessed at a valuation greater than its real and actual value. It is urged that, in view of this amendment, the rule

of sale price and strict market value is merely intended as a guide in the determination of relative assessments. It is contended that the evidence herein is insufficient to establish any inequality or discrimination in the assessment of the Bank's property. However, it may be doubted that the prevailing rule since the adoption of the 1902 amendment has been entirely abandoned by the enactment of chapter 237. If the Legislature so intended, language more direct and explicit would undoubtedly have been utilized. Furthermore, it will be observed that Section 2126-1, Mason's Minn.St.Supp.1938 (also enacted in 1935), gives the owner a defense where his property "has been assessed at a valuation greater than its real or actual value." It would seem that the statute merely emphasizes the necessity of uniformity and non-discrimination, which factors are not in any way inconsistent with the determination of value on a market-value basis. The most that can be read into the amendment is a mandate to the assessor and the Board to give due weight to the market value of the lands which are comparable in character, quality and location, so that there will be uniformity in the values.

The Supreme Court of this State has not ruled upon the construction and purpose of the amendment. However, it is evident that there is to be noted in the statute a direction to the assessor and the Board that, in determining valuation for tax purposes, other factors should be considered than the traditional, hypothetical query—What price could be obtained by an owner who was ready, willing and able, but not forced to sell, from a buyer who was ready, willing and able, but not forced to buy? It emphasizes the necessity of achieving equality in the distribution of the tax burden, and is support for the State's position that the value of property must not be viewed in the abstract. Furthermore, it tends to reiterate the principle which is steadily gaining recognition among courts and tax officials that the primary object of real estate taxation is to obtain a uniform tax base. All real property must bear taxation, not only commensurate with the burden which the property imposes upon the community, but equitably in comparison with other property assessed in the community.

One must recognize that in these times an assessor is confronted with a most perplexing problem in determining real estate values for taxation purposes. The statutes make no distinction in determining taxable values between investment property and property which may be devoted to a special purpose. If, for instance, the State of Minnesota did not have the gross earnings tax, it would obviously be difficult to determine the price for which a railroad depot could be sold at private sale. A somewhat similar question is submitted in determining the value of the Federal Reserve Bank building for taxation purposes. One must adopt a realistic approach to such a problem. No one factor should be controlling. Many facts and circumstances have evidentiary value in arriving at the true value contemplated by the statute. A rigid standard will only add to the confusion that undoubtedly does exist under the present system of computing values for real estate taxation. The assessor must be given a reasonable latitude in the exercise of his sound judgment in determining such values. The Court cannot say on this showing that the assessor has placed undue emphasis on any one factor, or that some elements of value have erroneously been given primary consideration, while others of equal importance have been relegated to secondary consideration. Throughout the years that this particular property has been on the tax rolls, it appears that, by conference and adjustment, the assessor and the taxpayer have been able to agree upon a fair valuation. The present valuation which is objected to herein is appreciably less than the sums heretofore agreed upon. Such circumstances would negative the charge that the assessor's present figures are arbitrary or discriminatory. Furthermore, it appears that due consideration and allowance have been given by the assessor on account of the architectural and structural limitations that may exist in this building, and the Court cannot overlook the fact that the assessor's values are approximately the same as those which the defendant itself carries on its books. It may be observed in passing that the Supreme Court of the United States has recently indicated that the full and true value of property for tax purposes bears a reasonable relation to the valuation that should be determined in condemnation proceedings. Great Northern Railway Co. v. Weeks, 297 U.S. 135, 56 S.Ct. 426, 80 L.Ed. 532. If, perchance, the state or federal authorities were proceeding against

this property in eminent domain, one can scarcely imagine that the officers of the Federal Reserve Bank would concede that the building which houses this bank, and which was erected at a cost of nearly three million dollars some twelve years ago, has now only a salvage value.

The assessor is equipped with many years of experience, and has access to technical knowledge and records which should make him peculiarly competent to arrive at a fair and equitable value of this property as contemplated by the statute. The depression has accentuated the difficulty in maintaining the degree of equality and the factor of non-discrimination which is required by our tax laws. The evidence indicates that the assessor has attempted to proceed scientifically and fairly, and his determination should not be disturbed in absence of a showing that his valuation is clearly too high. The taxpayer herein has failed to prove over-valuation by the character of evidence which would justify interference by this Court. If this Court attempted on the evidence to arrive at a lower valuation, such figure would not only fail to reflect the weight of the evidence, but it would be the mere selection of an arbitrary figure. The Court cannot find on the evidence submitted that the property was unlawfully or inequitably assessed.

Findings of fact and conclusions of law in accordance herewith may be submitted.