In the Matter of the Petitions of Malcolm A. McCANNEL, to Review Objections to Real Estate Taxes Payable in 1973, 1974, 1975, 1976 and 1977.

Malcolm A. McCANNEL et al., Relators (50446)–Respondents (50428 and 50469),

v.

COUNTY OF HENNEPIN, Relator (50428)–Respondent,

State of Minnesota, Relator (50469)–Respondent.

In re OBJECTIONS AND DEFENSES TO REAL PROPERTY TAXES FOR 1972–1975 ASSESSMENTS.

NORTHWEST AIRLINES, INC., petitioning taxpayer, Appellant,

v.

STATE of Minnesota, Respondent,

County of Hennepin, Respondent.

In re OBJECTIONS AND DEFENSES TO REAL PROPERTY TAXES FOR the 1973, 1974 AND 1975 ASSESSMENTS, Taxes Payable in 1974, 1975 and 1976, Respectively.

R. E. SHORT COMPANY (Calhoun Towers), petitioning taxpayer, Appellant,

v.

STATE of Minnesota, Respondent,

County of Hennepin, Respondent.

Nos. 50428, 50446, 50469, 49488 and 50122.

Supreme Court of Minnesota.

Sept. 5, 1980.

Johnson & Eastlund and Ralph W. Peterson, Minneapolis, for relator Malcolm McCannel et al.

Thomas L. Johnson, County Atty., Donald Lalor, Senior Asst. County Atty., Civil Div., Minneapolis, for County of Hennepin.

Warren Spannaus, Atty. Gen., C. H. Luther, Deputy Atty. Gen., James Neher, Sp. Asst. Atty. Gen., Dept. of Revenue, St. Paul, for State.

Mann, Green, Hayes, Simon, Murray & Johanneson, John A. Murray and Richard M. Gaalswyk, St. Paul, for amicus curiae.

SCOTT, Justice.

Several cases have been consolidated for purposes of this appeal. The Northwest Airlines case involves real estate tax assessments for the years 1972, 1973, 1974, and 1975 on property leased by Northwest Airlines from the Metropolitan Airports Commission. Northwest Airlines challenged the Commissioner of Revenue's appraisal of the property, claiming that the commissioner had overvalued it and that other property within the same taxing district had been systematically undervalued by application of Minn.Stat. § 273.11,[1] resulting in discriminatory and unequal distribution of property taxes in violation of Minn.Const. art. X, § 1 and U.S.Const. amend. XIV. The trial court made findings as to the values of the properties in question, and held that Minn.Stat. § 273.11 is not unconstitutional. We affirm the decision of the trial court on the constitutional issue, but remand this case to the trial court for new valuation findings based on our conclusion that the court was not free to adopt valuation figures higher than those placed on the property by the assessor.

The R. E. Short Co. case involves real estate tax assessments for the years 1973, 1974, and 1975 on Calhoun Towers, a 21-story apartment tower owned by Short in Minneapolis. Short claims that the property was overvalued in all three years; that it had been subject to unconstitutional discrimination in valuation by application of § 273.11, subd. 2; and that subd. 2 is unconstitutional under Minn.Const. art. X, § 1, and U.S.Const. amend. XIV. The trial court concluded that the property had not been overvalued; that § 273.11, subd. 2, is constitutional; and that therefore Short's property had not been unconstitutionally discriminated against. We affirm the decision of the trial court.

The McCannel case arises from Malcolm A. McCannel's challenge to property tax assessments on his residence in Minneapolis for the years 1972, 1973, 1974, 1975, 1976, and 1977. McCannel claimed that the assessor for the City of Minneapolis overvalued his property; that his property was discriminated against in violation of Minn. Const. art. X, § 1, and U.S.Const. amend. XIV by virtue of the application of § 273.11, subd. 2; and that § 273.11, subd. 2, is unconstitutional. The case was transferred to the tax court pursuant to Minn.Stat. § 271.-01, subd. 5 (1978). There, the case was combined for trial on the constitutional issue with a similar petition filed by taxpayer Edward N. Nelson. The court concluded that although the assessor's valuation of McCannel's property was not excessive, the undervaluation of similar residential property due to assessment practices impermissibly discriminated against McCannel. The tax court also held that the operation of § 273.11, subd. 2, discriminated against McCannel, and that the statute is unconstitutional. We reverse on the issue of the constitutionality of § 273.11, subd. 2, but we agree with the tax court that the procedures used to assess other residential property may have resulted in discrimination in fact against McCannel's property. We remand this case for the introduction of more complete evidence on the issue of the undervaluation of other property resulting from assessment practices.

The tax court refused to grant any relief to petitioner Nelson on the basis of its decision that § 273.11, subd. 2, is unconstitu-

---

1. Minn.Stat. § 273.11, subd. 2, was added in 1973 and was amended several times in the 1970's. The changes are set out *infra*. Several versions of the statute are challenged in the present cases, and references to § 273.11 herein include all relevant versions of the statute.

tional. The court stated that the market value of Nelson's property must be judicially determined before the appropriate measure of relief could be calculated for Nelson's property. Because we hold that § 273.11, subd. 2, is constitutional, we conclude that Nelson is not entitled to recover on his claim of statutory discrimination.

The factual background to the valuation issues in each of these cases can be summarized briefly. Northwest Airlines' leased property at the Minneapolis–St. Paul International Airport consists of two parcels: Parcel 8000 containing Northwest's main base facilities, and Parcel 8010 containing Northwest's cargo handling facility. Northwest is treated as feeholder of the property for purposes of the taxing statute. Extensive testimony from several expert witnesses was introduced at trial concerning various methods of valuation and the valuation figures arrived at by the experts.[2] Essentially, the valuation problem in this case stems from the property's character as unique, special purpose property. It is significantly more valuable as an airplane facility than it would be if used for any other purpose.

Three standard approaches to valuing property–the income approach, the market data approach, and reproduction cost less depreciation–yield widely varying results when applied to special purpose property. At trial, the experts agreed that although an appraisal is usually a synthesis of all three approaches, the reproduction cost approach is best suited for estimating the value of special purpose property. The major difference in the experts' methods of valuation was that Northwest's expert witnesses substantially reduced their estimates under the reproduction cost approach by allowing for economic obsolescence and functional depreciation.

The property at issue in the Short case, Calhoun Towers, was acquired by Short out of receivership in 1968. At trial, Short challenged the city assessor's conclusions and methods. The experts who testified stated that they considered all three approaches to valuation (income, market data, and reproduction cost less depreciation), but relied most heavily on the income approach. Michael Livingston, a certified assessor from the Minneapolis Assessor's Office, primarily used market or economic rent figures to value the property under the income approach; that is, in addition to considering the actual income and expense figures offered by Short for Calhoun Towers, he considered potential income and expenses derived from comparisons with similar properties. Livingston concluded that the property was worth $3,200,000 in 1973 and 1974, and $3,600,000 in 1975. Short's expert, Howard Lawrence, relied on the actual income and expense figures put forward by Short and valued the property at $2,500,000 in 1973, $2,200,000 in 1974, and $2,500,000 in 1975.

Finally, in the *McCannel* case, the city assessor valued McCannel's residence at $213,000 for the years 1972 through 1976, and $230,000 for 1977. At trial, McCannel challenged the assessor's findings, claiming that the discount allowed by the assessor for the distinctive nature of his residence was too low. The tax court adopted the city assessor's findings, and McCannel does not challenge these valuation findings on appeal.

Several issues are raised in these cases for our consideration:[3]

(1) Is Minn.Stat. § 273.11, subd. 2, unconstitutional under Minn.Const. art. X, § 1, or U.S.Const. amend. XIV?

(2) Did the tax court in the McCannel case have jurisdiction to determine the constitutionality of a tax statute?

(3) Was McCannel's property unconstitutionally discriminated against because of

---

2. The valuation figures reached by the assessor, Northwest's expert witnesses, and the trial court are contained in the appendix to this opinion.

3. An excellent discussion of several of the issues raised in these cases may be found in Note, *Grounds and Procedures for Attacking Real Property Tax Assessments in Minnesota*, 4 Wm. Mitchell L.Rev. 371 (1978).

the way in which property values were determined?

(4) Are the trial court's findings as to the value of the property in question in the Short case supported by the evidence?

(5) Are the trial court's findings as to the value of the property in question in the Northwest Airlines case supported by the evidence?

(6) Was it proper for the trial court in the Northwest Airlines case to adopt valuation figures higher than those placed on the property by the assessor?

1. In 1906, the Minnesota Constitution was amended to state that "taxes shall be uniform upon the same class of subjects." Minn.Const. art. X, § 1. This amendment expressly enabled the legislature to classify property for purposes of taxation and thereby tax different classes of property at different rates. Section 273.13 (1978) outlines the basic present–day classification system. However, the underlying basis for valuing and taxing real property remains "market value" or "estimated market value"; certain classes of property are then taxed on a percentage of market value. Market value is defined in Minn.Stat. § 272.03, subd. 8 (1978): " 'Market value' means the usual selling price at the place where the property to which the term is applied shall be at the time of assessment; being the price which could be obtained at a private sale and not at a forced or auction sale." Minn.Stat. § 273.11, subd. 1, provides that subject to certain limitations, all property shall be valued at its market value.

In 1973, the Minnesota Legislature enacted a new limitation on the value of real property for ad valorem property tax purposes. 1973 Minn.Laws, ch. 650, art. 23, added a new subdivision to § 273.11, creating a "limited market value" for tax purposes. This statute provided that for valuing certain types of property (all residential), increases over the previous year's valuation would be subject to a 5 percent maximum. Any excess increase in value would be carried over to the next year, again subject to the 5 percent limitation. The 5 percent limitation did not apply to property which had no previous valuation, such as new construction, or to nonresidential property.

In 1975, subdivision 2 was amended to change the maximum increase to the greater of 10 percent of the previous valuation or 25 percent of the total increase in value over the previous valuation. The scope of subdivision 2 was also expanded to include all classes of property, whether residential, commercial, or industrial. 1975 Minn.Laws, ch. 437, art. 8, § 5.

In 1976, the legislature provided that any residential or agricultural property that had not benefited from the 5 percent limitation in the 1973 and 1974 assessments, plus any new construction, would be valued at the average percentage of market value in the assessment district if its market value exceeded the limited market value for its class of property by more than 10 percent. 1976 Minn.Laws, ch. 345.

Next, in 1977, subdivision 2 was amended to provide a formula for bringing limited market value up to estimated market values. Differences were to be phased in gradually at 10 percent each year, or if the total increase was more than 40 percent, the increase was to be phased in over a four–year period. 1977 Minn.Laws, ch. 423, art. 4, § 4.

Finally, in 1979, the legislature determined that the limited market value concept should be more rapidly abolished by increasing limited market values for the 1979 assessment year by 10 percent of the preceding limited market value or 50 percent of the difference between the current year's estimated market value and the preceding limited market value, whichever is greater. Beginning with the 1980 assessment year, all property will be assessed at full market value. 1979 Minn.Laws, ch. 303, art. 2, § 7; ch. 303, art. 2, § 38, subd. 1.

■ The taxpayers in the instant cases argue that because the limitations of § 273.-11, subd. 2, were not applicable to their properties during the years in question, or because the application of the limitation provisions did not result in as low a ratio of

limited market value to actual market value as those of other properties within the same taxing district, the petitioning taxpayers' properties were thereby discriminated against in violation of the Minnesota and United States Constitutions. Furthermore, according to the taxpayers, the entire tax limitation system enacted under § 273.11, subd. 2, because it applies to some properties and not others, and because it creates disparities in the proportion of market value that is subject to taxation among various properties, is unconstitutional as a violation of equal protection.

■ After reviewing the parties' positions on the equal protection issue, we conclude that the parties have failed to correctly identify and articulate the nature of the claim. The taxpayers insist that § 273.11, subd. 2, does not create a classification system for real property. Instead, they argue that the *application* of the limitation statute discriminates against their properties without creating classifications. The trial court in the Northwest Airlines case, while denying the taxpayers' claim, states that the constitutionality of a statute creating classes is not in issue here. However, a close look at the essence of the taxpayers' claim reveals that the constitutionality of a classification scheme is exactly what they are challenging. The taxpayers argue that because increases in value were limited for tax purposes to 5 percent or 10 percent, property falling within a protected class is taxed at less than its full value, thereby shifting the tax burden in an ad valorem tax system to property falling outside of the protected class. Moreover, the greater the increase in value in property within a

given year, the more protection that property is afforded, proportionally, from corresponding increases in taxation. Thus, the taxpayers' claim is really that § 273.11, subd. 2, created a class of property–property which has greatly increased in value over a short period of time–and that class of property is cushioned temporarily against taxation at its full market value to the detriment of other property, including the taxpayers' property. Even though the limitation provision does not speak in terms of classes, this is precisely what it creates for purposes of equal protection analysis.[4] By definition, a facial challenge to a statute on equal protection grounds asserts that at least two classes are created by the statute, that the classes are treated differently under the statute, and that the difference in treatment cannot be justified.

■ All of the cases cited by the taxpayers to support their proposition that arbitrary and systematic discrimination in tax assessments is unconstitutional involve the discriminatory *application* of an otherwise constitutional statutory scheme of taxation by local officials.[5] The valuation process itself, not the statutory scheme of percentages and rates to be applied to the resulting market value, is at issue in these cases. *Sunday Lake Iron Co. v. Township of Wakefield*, 247 U.S. 350, 38 S.Ct. 495, 63 L.Ed. 1154 (1918), and several other cases state as *dicta* that the equal protection clause provides protection against arbitrary discrimination resulting from the express terms of a statute as well as from a statute's improper execution. 247 U.S. at 352, 38 S.Ct. at 495. We accept this statement of the law. However, it is well–established

---

4. The Minnesota constitutional provision that taxes shall be uniform upon the same class of subjects has been interpreted to be no more restrictive upon the legislature's power to tax or classify than the equal protection clause of the Fourteenth Amendment to the United States Constitution. Therefore, our discussion of classification and taxation under the equal protection clause is equally applicable to the taxpayers' state constitutional claim.

5. *Cumberland Coal Co. v. Board of Revision of Tax Assessments*, 284 U.S. 23, 52 S.Ct. 48, 76 L.Ed. 146 (1931); *Sioux City Bridge Co. v.*

*Dakota County*, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923); *Sunday Lake Iron Co. v. Township of Wakefield*, 247 U.S. 350, 38 S.Ct. 495, 63 L.Ed. 1154 (1918); *Ploetz v. County of Hennepin*, 301 Minn. 410, 223 N.W.2d 761 (1974); *Bethke v. County of Brown*, 301 Minn. 382, 223 N.W.2d 757 (1974); *Johnson v. County of Ramsey*, 290 Minn. 307, 187 N.W.2d 675 (1971); *Dulton Realty, Inc. v. State*, 270 Minn. 1, 132 N.W.2d 394 (1964); *In re Petition of Hamm v. State*, 255 Minn. 64, 95 N.W.2d 646 (1959).

that legislative classifications not based on a suspect class nor affecting fundamental interests, as these have been defined by the United States Supreme Court, must be upheld under the equal protection and uniformity clauses unless there is no reasonable basis for the classification. For example, in *Elwell v. Hennepin County,* 301 Minn. 63, 221 N.W.2d 538 (1974), we upheld a land classification system for tax purposes which permitted certain real estate devoted to agricultural use to be valued without reference to nonagricultural factors. The effect of the classification statute was to shield this land from taxation on its full market value. We stated:

"The propriety of classification for the purpose of legislation is primarily for the legislature. Laws passed by the legislature are presumed to be valid, so we assume that the legislature makes inquiry and rightly determines the propriety of the classification which it adopts. *This court will not disturb the legislative determination unless the classification is clearly arbitrary and has no reasonable basis.* [Citations omitted.] The uniformity clause of the Minnesota Constitution is not more restrictive than the equal protection clause of the Fourteenth Amendment of the Federal Constitution."

301 Minn. at 74, 221 N.W.2d at 546, quoting *In re Taxes on Property of Cold Spring Granite Co.,* 271 Minn. 460, 466, 136 N.W.2d 782, 787 (1965) (emphasis added in *Elwell*). In an earlier case also involving a legislative classification for tax purposes, we held that classification is permitted if there is a reasonable ground for making a distinction and if the classification made bears a reasonable relation to a permitted end of government action. The difference between classes need not be great, and if any reasonable distinction can be found, a court should sustain the classification. Furthermore, the legislature had broad discretion in determining that a classification bears a reasonable relation to a governmental purpose, and the courts should not interfere unless there is palpable error. *Montgomery Ward & Co. v. Commissioner of Taxation,* 216 Minn. 307, 311, 12 N.W.2d 625, 627 (1943).

This court and other courts have given legislative classifications especially wide latitude in the area of taxation. For example, in *Village of Burnsville v. Onischuk,* 301 Minn. 137, 222 N.W.2d 523 (1974), *appeal dismissed,* 420 U.S. 916, 95 S.Ct. 1109, 43 L.Ed.2d 388 (1975), we upheld a multi-county taxation system against a claim that it was unconstitutional because it imposed non-uniform taxes and distribution of benefits. We stressed that the legislature must be allowed to develop solutions to social problems free from undue restraint by the courts, and quoted a passage from the United States Supreme Court's decision in *San Antonio School District v. Rodriguez,* 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973), which is applicable to the present case:

"The broad discretion as to classification possessed by a legislature in the field of taxation has long been recognized. * * * [T]he passage of time has only served to underscore the wisdom of that recognition of the large area of discretion which is needed by a legislature in formulating sound tax policies. * * * It has * * * been pointed out that in taxation, even more than in other fields, legislatures possess the greatest freedom in classification."

* * * No scheme of taxation, whether the tax is imposed on property, income, or purchases of goods and services, has yet been devised which is free of all discriminatory impact. In such a complex arena in which no perfect alternatives exist, the Court does well not to impose too rigorous a standard of scrutiny lest all local fiscal schemes become subjects of criticism under the Equal Protection Clause.

301 Minn. at 151, 222 N.W.2d at 531 (*Rodriguez* quoting in part from *Madden v. Kentucky,* 309 U.S. 83, 87–88, 60 S.Ct. 406, 407–08, 84 L.Ed. 590 (1940)). *See also Kahn v. Shevin,* 416 U.S. 351, 355, 94 S.Ct. 1734, 1737, 40 L.Ed.2d 189 (1974).

Finally, a recent case in California presented the California Supreme Court with arguments similar to those advanced

by the taxpayers in the instant case. In *Amador Valley Joint Union High School District v. State Board of Equalization*, 22 Cal.3d 208, 538 P.2d 1281, 149 Cal.Rptr. 239 (1978), petitioners challenged the Jarvis–Gann initiative *inter alia* on the ground that it violated equal protection because it required property to be valued for ad valorem tax purposes at its acquisition value or its value in 1975. Petitioners claimed that the roll–back of valuations constituted an arbitrary discrimination because two substantially identical homes could be assessed and taxed at different levels depending upon their date of acquisition. The California court rejected their contention, noting that the states have broad discretion in taxation matters; that the states are not bound in taxation matters to "precise, scientific uniformity"; and that a system of taxation will be upheld unless it is "palpably arbitrary" and not supported by a rational basis. 22 Cal.3d at 234, 583 P.2d at 1293, 149 Cal.Rptr. at 250. The court then distinguished the cases relied upon by the petitioners, including *Cumberland Coal Co. v. Board of Revision of Tax Assessments*, 284 U.S. 23, 52 S.Ct. 48, 76 L.Ed. 146 (1931), and *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923), on the ground that these cases addressed themselves to discriminatory applications of valid statutes by local officials, not the constitutionality of the statutes themselves. The court stated:

Petitioners, in response, rely upon a line of cases which hold, as a general proposition, that the intentional, systematic *undervaluation* of property similarly situated with other property assessed at its full value constitutes an improper discrimination in violation of equal protection principles. [Citations omitted.]

* * * These cases [relied upon by petitioners] do not purport to confine the states to a current value system under equal protection principles or to state an exception to the general rule accepted both by the United States Supreme Court and by us, as previously noted, that a tax classification or disparity of tax treatment will be sustained so long as it is founded upon some reasonable distinction or rational basis.

22 Cal.2d at 235, 583 P.2d at 1293, 149 Cal.Rptr. at 251 (emphasis in original).

■ The reasoning exemplified by the decisions discussed above makes it clear that in the instant cases, the property tax classifications contained in § 273.11, subd. 2, must be upheld against an equal protection challenge if a rational basis for the legislature's distinctions can be found. Moreover, we cannot strike down the classification unless there is a palpable error, an explicit demonstration that the classification results from arbitrary discrimination. The state and county have put forth plausible reasons to support the legislative classifications contained in § 273.11, subd. 2. At a time of rapid inflation and periodic reassessments which were often unable to keep pace with rising property values, the limitation provision allowed significant increases in property taxes to be absorbed gradually by the taxpayer. Gradual implementation of significant tax increases promoted stability in ownership by giving property owners time to adjust to and make provisions for the increases rather than forcing some owners to sell their property because of lack of funds to pay the taxes.

■ The taxpayers' arguments that the limitation provision protected some taxpayers only at the expense of others, that these other taxpayers were not necessarily better able to pay higher property taxes, and that continued inflation perpetuated what were intended to be temporary inequities, address the wisdom of the legislature's program, not its constitutionality. It has been made clear by the United States Supreme Court that the wisdom and social effects of such programs lie within the responsibility of the legislatures, not the courts:

The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted. Thus,

we will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.

*Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979) (footnote omitted). In another recent case challenging a statute on equal protection grounds, the Supreme Court stated:

> Most laws classify, and many affect certain groups unevenly, even though the law itself treats them no differently from all other members of the class described by law. When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern. [Citations omitted.] The calculus of effects, the manner in which a particular law reverberates in a society, *is a legislative and not a judicial responsibility.*

*Personnel Administrator of Massachusetts v. Feeny,* 442 U.S. 256, 271–72, 99 S.Ct. 2282, 2291, 60 L.Ed.2d 870 (1979) (emphasis added).

It should be noted that the Minnesota legislature did make several adjustments to § 273.11, subd. 2, over the years. These adjustments were made at least in part to deal with the kinds of inequities noted by the taxpayers in their briefs. Furthermore, the limitation provision was repealed in 1979, thus illustrating precisely the evolutionary democratic process relied upon by the Supreme Court in *Vance v. Bradley* to change legislative policies. The taxpayers in the instant cases have already had their grievances vindicated in the political arena.

We conclude that the taxpayers' equal protection challenge to § 273.11, subd. 2, must fail. There is at least a rational basis to support the distinction drawn by the legislature, and our role in scrutinizing taxation classifications under the equal protection clause goes no further.

In the *McCannel* case, Hennepin County argues that the tax court has no authority to determine the constitutionality of legislative acts. Although we have never addressed the issue of the scope of the tax court's jurisdiction over constitutional questions, we upheld the constitutionality of establishing a tax court as the sole arbiter of disputes assigned to it, subject to review by this court, in the recent case of *Wulff v. Tax Court of Appeals,* 288 N.W.2d 221 (Minn. 1979). We noted in *Wulff* that the tax court is essentially an administrative agency, deriving its power from a grant by the legislature. *Id.* at 222–23. As a general rule, administrative agencies lack the power to declare legislation unconstitutional. Instead, these issues must be raised in a court of the judiciary. *Johnson v. Robison,* 415 U.S. 361, 368, 94 S.Ct. 1160, 1166, 39 L.Ed.2d 389 (1973); *Public Utilities Commission of California v. United States,* 355 U.S. 534, 539, 78 S.Ct. 446, 450, 2 L.Ed.2d 479 (1958); *Starkweather v. Blair,* 245 Minn. 371, 394, 71 N.W.2d 869, 884 (1955); *Bielke v. American Crystal Sugar Co.,* 206 Minn. 308, 312, 288 N.W. 584, 586 (1939). In the recent decision of *Ondler v. Peace Officers Benefit Fund,* 289 N.W.2d 486 (Minn. 1980), we concluded that the Workers' Compensation Court of Appeals lacks jurisdiction to decide the constitutionality of a statute challenged on equal protection grounds.

■ However, we also emphasized in *Wulff* that the tax court, unlike other administrative agencies, is given uniquely judicial powers. Decisions of the tax court are accorded the same finality and deference as those of the district court. The tax court may acquire jurisdiction in the first instance through transfers of cases from the district court, which does have jurisdiction to determine the constitutionality of legislative acts.

■ Minn.Stat. § 271.01, subd. 5 (1978) establishes the subject matter jurisdiction of the tax court in very broad language:

> Except for an appeal to the supreme court or any other appeal allowed under this subdivision, the tax court shall be the sole, exclusive, and final authority for the hearing and determination of all questions of law and fact arising under the

tax laws of the state * * * in any case that has been transferred by the district court to the tax court.

This language indicates that when a case is transferred from the district court to the tax court, the tax court acquires the district court's jurisdiction to decide all issues in a particular case, implicitly including all constitutional issues. The language designating the tax court as the "sole, exclusive, and final authority" for all issues raised in a particular case suggests that the legislature intended the tax court to have the power to decide each case completely. We believe that the tax court will function most effectively and expeditiously if it has the power to decide constitutional issues. We therefore uphold the jurisdiction of the tax court to determine the constitutionality of tax statutes when, in the first instance, the constitutional issue is raised in the district court before the case is transferred to the tax court.[6]

3. The tax court in the McCannel case accepted the city assessor's estimated market values for McCannel's residence for the years 1972 through 1976 ($213,000) and 1977 ($230,000). McCannel does not dispute these figures on appeal, and therefore the basic valuation of McCannel's property is not at issue. The tax court did find, however, that McCannel's property had been discriminated against through the operation of assessment practices vis-a-vis other residences in Minneapolis valued at more than $100,000 during the same period. This issue is separate from the constitutionality of the limited market value provisions of § 273.11, subd. 2. McCannel's claim is that in arriving at estimated market values for comparable properties over $100,000, the assessor followed practices which systematically underestimated the value of these comparables, thus unconstitutionally discriminating against McCannel's property. Analytically, this claim is one of discrimination in fact, and therefore the cases cited in footnote 5 —— are directly on point.

To show discrimination in the valuation process, a taxpayer must demonstrate that his property was valued on a different basis than other comparable property in the same taxing district, and that this other property was systematically or arbitrarily undervalued. In a leading Minnesota case on this issue, *In re Petition of Hamm v. State*, 255 Minn. 64, 95 N.W.2d 649 (1959), this court stated:

The right to uniformity and equality is the right to equal treatment in the apportionment of the tax burden. Uniformity of taxation does not permit the systematic, arbitrary, or intentional valuation of the property of one or a few taxpayers at a substantially higher valuation than that placed on other property of the same class. * * *

* * * Absolute equality is impracticable of attainment and the taxpayer may not complain unless the inequality is substantial. Mere errors of judgment in estimating market value of property usually will not support a claim of discrimination.

95 N.W.2d at 654, 255 Minn. at 70 (footnotes omitted). Although the *Hamm* opinion goes on to state as dictum that there must be something equivalent to an intentional violation of uniformity to support a claim of discrimination, we expressly disavowed this requirement in our recent decision in *United National Corp. v. County of Hennepin*, 299 N.W.2d 73 at 76.

The evidence introduced at trial to support McCannel's claim that other property had been systematically undervalued consisted of the testimony of Lynn Folkens, an appraiser in the Minneapolis Assessor's Office during the years in question. Folkens testified that homes over $100,000 were regarded as a special group by the city assessor, and their appraisal values were not increased as rapidly as those of other homes. Folkens stated that such properties were considered to be a separate subgroup because they were not believed to be inflat-

6. In the instant case, respondent McCannel adequately preserved his constitutional objections to the application of Minn.Stat. § 273.11, subd.

2, by raising such issues in the trial court before transfer to the tax court.

ing as fast as other homes, and were given a small percentage increase or no increase at all. Market data obtained from Hennepin County relating to ten homes in McCannel's neighborhood, however, suggests that the selling price of comparable homes increased rapidly. As a result, most of these homes were worth substantially more than the estimated market values assigned to them for tax purposes. For the years 1975–1977, the ratio of estimated market values to sales prices for the ten homes on which data was introduced averaged 63%. Based on this evidence, the tax court concluded that because McCannel's property had consistently been valued at 100% of market value, his property had been unconstitutionally discriminated against, and he was entitled to have the estimated market value of his home reduced by 37%.

■ We agree with the tax court that the deliberate treatment of houses valued at more than $100,000 by a special method of appraisal which results in a substantial undervaluation of this group of houses is the type of arbitrary or systematic discrimination prohibited in *Hamm* and other cases. Unlike the situation at issue in *United National Corp. v. County of Hennepin*, in which the disparities between assessed values and sale prices followed no discernible pattern and were not due to different assessment methods, the assessor's office in the instant case adopted a policy of not increasing the estimated values of houses over $100,000 during the years in question, or increasing them only by a small percentage. Although Folkens testified that this policy was based on an incorrect assumption that expensive houses were not inflating as rapidly as other homes, and was not intended to result in undervaluation, the law is clear that a plan of assessment which is discriminatory in fact cannot be justified by good faith or belief in its validity. *Cumberland Coal Co. v. Board of Revision of Tax Assessments*, 284 U.S. 23, 52 S.Ct. 48, 76

L.Ed. 146 (1931); *In re Petition of Hamm v. State*, 255 Minn. 64, 95 N.W.2d 649 (1959). Therefore, if the undervaluation of other houses over $100,000 was substantial during the years in question, McCannel is entitled to a reduction in his taxes because his residence was valued at full market value.

The trial court determined the ratio of estimated market value to sales price of each of the ten comparable properties for which it had data, and then averaged the ratios to arrive at a percentage by which the estimated market value of McCannel's property should be reduced. Although McCannel maintains that he is entitled to have his property valued at the lowest percentage of estimated market value to actual value which was applied to any residential property in Minneapolis during the years 1973–1978, we agree with the trial court that an average ratio provides the appropriate measure of relief. To permit a taxpayer to lower the assessed value of his property in proportion to the most grossly undervalued property within the taxing district would give the taxpayer a windfall merely because one other property was underassessed; the fact that most other property owners were carrying their share of the tax burden would be irrelevant if this measure of relief were used. In the large taxing district such as Minneapolis during a time of rapidly changing property values, a taxpayer whose property was fairly assessed could always find a substantially underassessed property and claim that the was entitled to a similar underassessment. Such a result would be chaotic, and would place an impossible burden on the assessor's office to appraise each parcel of property with mathematical accuracy.

■ Courts in other jurisdictions that have addressed this issue have adopted the average percentage of undervaluation of a given class of property as the appropriate measure of relief in unequal assessment cases.[7] *Dulton Realty, Inc. v. State*, 270

7. *See, e. g., In re Kents, 2124 Atlantice Ave., Inc.*, 34 N.J. 21, 166 A.2d 763 (1961); *Baken Park, Inc. v. County of Pennington*, 79 S.D. 156, 109 N.W.2d 898 (1961); *Robinson v. State Tax*

*Commission*, 216 Or. 532, 339 P.2d 432 (1959); Note, *The Minnesota Supreme Court 1964–1965*, 50 Minn.L.Rev. 469, 552–5 (1966); Note, *The Road to Uniformity in Real Estate Taxa-*

Minn. 1, 132 N.W.2d 394 (1965), and *In re Petition of Hamm v. State, supra,* two earlier decisions by this court which support the use of the lowest percentage of assessed value to market value as the measure of relief, can be distinguished factually from the instant case.[8] We therefore reject the broadest reading of these two cases, and conclude that the appropriate remedy in cases such as the present one, where a taxpayer challenges faulty methods of calculating estimated market values which lead to the systematic or arbitrary underassessment of property other than his own, is to reduce the estimated market value of the taxpayer's property for tax purposes by the *average* percentage by which other property in the same class is underassessed. This measure of relief will put us in accord with other jurisdictions that have faced this issue, and will provide a fair and effective remedy for systematic and substantial undervaluations of other property without allowing a property owner to escape his share of the tax burden and gain a windfall merely because one other parcel of property in a taxing district may be significantly underassessed.

The tax court in the McCannel case based its finding as to the average ratio of estimated market value to actual value of homes worth more than $100,000 in Minneapolis on market data from ten homes in McCannel's neighborhood. Market data from all other homes valued at more than $100,000 was not introduced at trial. Based on our recent decision in *United National Corp. v. County of Hennepin,* 299 N.W.2d 73 (1980), we conclude that the evidence presented was insufficient to establish the percentage by which other property in this group was undervalued during the years 1973–1978. For example, the total number of homes over $100,000 in Minneapolis during this period is not established anywhere in the record. Thus it is impossible to determine how significant a sample is presented by these ten homes or whether they are representative of other property within the group. All of the homes are located in the same area, and if property values were increasing more rapidly in this neighborhood than in other neighborhoods in Minneapolis containing similar homes, the percentage of underassessment within the group will be overstated by the ten homes. Furthermore, the selling price of each home was assumed to be equal to its actual market value. Although selling price is usually a good indicator of market value if the sale is an arm's length transaction between parties with equal bargaining power, the terms or conditions of a sale may affect the selling price and make it unrepresentative of the property's actual value. The parties should at least have the opportunity to scrutinize and challenge sales data that is used to demonstrate market value. In addition, a larger sampling of sales would lessen the impact of individual variations between selling price and market value. Finally, the market data on the ten sales considered by the

tion: *Valuation and Appeal,* 124 U.Pa.L.Rev. 1418, 1441–6 (1976).

8. *Dulton* and *Hamm* involve situations in which the assessors used various percentages of estimated value (often referred to as "common ratios") as the "full and true value" on which property taxes were based. Thus, all property was taxed on a percentage of its full estimated value and the percentages used were adopted by the assessors without statutory authority. (This practice was repeatedly disapproved of by this court and the state legislature and is no longer used.) The taxpayers in *Dulton* and *Hamm* challenged the percentages applied by the assessors to various properties, because the assessors deliberately used a higher percentage to tax their property than to tax other property. This court based its relief in the two cases in part on the fact that the assessors' use of different percentages was intentional and not sanctioned by legislative authority. In those cases, the varying percentages used were adopted by the assessors and applied to estimated market values. In the instant case, by contrast, the taxpayer is challenging miscalculations in the original determination of estimated market values for other, comparable properties. In addition, in *Dulton,* the percentage applied to the taxpayer's property by this court as a remedial measure was 30%, the figure used by the Duluth city assessor to value all residential property within the city. Thus, the measure of relief was the lowest percentage only in the sense that it was the lowest common ratio used by the assessor to value a particular type of property.

tax court does not indicate the year in which each sale took place. It is quite possible that the percentage of underassessment of homes valued at more than $100,-000 varied significantly from year to year and that a breakdown of sales by year would provide a more accurate percentage of underassessment for each year in question. Therefore, we remand the McCannel case to the tax court to permit the introduction of more complete evidence on the extent of underassessment of other homes in Minneapolis over $100,000 during the years 1973–1978.

Because we have concluded that the limitation provisions contained in Minn.Stat. § 273.11, subd. 2, are constitutional, and because petitioner Nelson's claim is based only on § 273.11, subd. 2, and not on discrimination in fact, Nelson's claim for relief must fail.

4. Short claims, as noted above, that the city assessor overvalued Short's property, Calhoun Towers, for the years 1973–1975. Experts for both parties agreed that in assessing rental property such as this, the income approach to valuation is the most useful and reliable method. Livingston, an assessor from the Minneapolis Assessor's Office, relied upon income and expense figures constructed from a study of similar properties. Short's expert witness relied almost entirely upon Short's summary of actual income and expenses for the years in question. The trial court found that the city assessor correctly considered the various approaches to valuation and that the income figures and capitalization rate derived by the assessor were reasonable and well–supported by the evidence. The court therefore concluded that Short's property had not been overvalued for tax assessment purposes.

■ In a proceeding brought by a taxpayer to challenge a property valuation, there is a prima facie presumption that the assessor's valuation is proper, and the taxpayer has the burden of proving that the assessment is excessive. *State v. Fridley Recreation & Service Co.*, 288 Minn. 218, 179 N.W.2d 172 (1970); *Red Owl Stores,*

*Inc. v. Commissioner of Taxation,* 264 Minn. 1, 117 N.W.2d 401 (1962). Moreover, a trial court's findings of fact in a tax proceeding must be sustained upon review unless they are clearly erroneous and not reasonably supported by the evidence as a whole. *Northerly Centre Corp. v. Ramsey County,* 311 Minn. 335, 248 N.W.2d 923 (1976); *Alstores Realty, Inc. v. State,* 286 Minn. 343, 176 N.W.2d 112 (1970).

The city assessor's use of reasonable, projected income and expense figures to value the property under the income approach rather than reliance solely on figures produced by the taxpayer finds support in *Northerly Centre Corp. v. Ramsey County,* 311 Minn. at 337, 248 N.W.2d at 925, n. 2. Actual income is one factor to be considered, but the income approach looks to the income the property will produce or could produce in its present condition, and possibly the income that it would produce if changed. *In re Potlach Timber Co.,* 160 Minn. 209, 199 N.W. 968 (1924). Although Short argues that the property's income–producing capabilities are limited by FHA restrictions on rent increases, and we agree that such restrictions might well be taken into account in certain cases, Short himself admitted that he had increased rents without FHA approval. Moreover, as the trial court correctly points out, actual income and expense figures are misleading in this instance because Short bought the property out of receivership, when an income approach to valuation would have shown the property to be worthless at best. Finally, the price paid by Short for the property supports the assessor's rather than Short's valuation.

■ Therefore, we conclude that the city assessor's valuation of the property, adopted by the trial court, is more than adequately supported by the evidence as a whole, and we affirm the findings of the trial court.

5. At trial, Northwest Airlines challenged the assessor's valuation of its airport facilities. As noted above, the valuation controversy in this case is a result of the fact that the property is unique, special

purpose property. The trial court adopted the basic valuation figures for land and improvements introduced by Northwest's expert witness, Mr. Shenehon, but rejected the large depreciation allowed by Northwest's experts for economic and functional obsolescence. The court followed a consistent theory of valuation and arrived at final valuation figures which were sometimes higher and sometimes lower than those originally placed on the property by the assessor.

▮ The experts were in basic agreement that special purpose property is most reliably valued by calculating its reproduction cost, i. e., the value of the land plus the cost of reproducing or constructing its improvements, less depreciation. "Market value," the basis for all assessment valuation, is an attempt to create a fictitious sale of the subject property by assuming an owner willing to sell and a buyer desiring to buy. When, as in the instant case, there is no actual buyer desiring to purchase the property for continuation of its special use, the property's highest and best use as a special purpose property must still be considered for valuation purposes. The very nature of special purpose property is such that market value cannot readily be determined by the existence of an actual market, and therefore other methods of valuation, such as reproduction cost, must be resorted to. See, e. g., Delaware Racing Association v. McMahon, 340 A.2d 837, 842 (Del.Super. 1975); State v. Federal Reserve Bank of Minneapolis, 25 F.Supp. 14, 18 (D.Minn. 1938). Although much of Northwest's expert testimony at trial was intended to demonstrate that there were no actual buyers for Northwest's property for use as an

airplane facility, and therefore it should not be valued as such, the trial court correctly discounted this testimony.

▮ Extensive testimony was also introduced by Northwest to demonstrate that the value of the property should be reduced to reflect functional [9] and economic [10] obsolescence. We agree with Northwest that these factors may be relevant to the valuation of property continued in its present use. However, the trial court was convinced that Northwest's experts used functional and economic obsolescence to consider changes which would have to be made to adapt the property for a *different* use. The trial court's conviction that Northwest's experts manipulated these concepts to impermissibly interject an allowance for modification for a different use buyer finds support in the experts' own testimony. We therefore conclude that in this case the trial court acted well within its discretion in rejecting Northwest's expert testimony on functional and economic obsolescence.

Northwest argues that the trial court's method of valuing its property as unique property violates the general rule that property should be valued at its market value rather than its intrinsic value.[11] Although the concepts of intrinsic value and unique property are closely parallel in cases such as this, the trial court did value the property by determining its reproduction cost, an accepted method of estimating market value. To state it differently, the trial court determined the value of the property according to its highest and best use as an airport facility without regard to who might own it. The fact that its intrinsic value to Northwest Airlines might be equal to its value to a hypothetical buyer as

---

9. Functional obsolescence can be defined as "the inadequacy or obsolescence of the facility due to developments which have made it incompetent to perform its function properly or economically * * *," *Congregation of the Sons of Israel v. State*, 54 A.D.2d 794, 804, 387 N.Y.S.2d 738, 749 (1976); or "the inability of a structure to perform adequately the function for which it is *currently employed*." Real Estate Appraisal Terminology 74 (B. Boyce ed. 1975) (emphasis added).

10. Economic obsolescence can be defined as "impairment of desirability or useful life arising from factors external to the property, such as economic forces or environmental changes which affect supply–demand relationships in the market." *Id.*, at 79.

11. Intrinsic value refers to the value of property to the specific person who happens to own it. *In re Potlach Timber Co.*, 160 Minn. 209, 199 N.W. 968 (1924).

an airport facility does not render the trial court's method of valuation invalid.

▮▮ 6. Although we approve of the trial court's methods of valuing Northwest's property, we agree with Northwest that the trial court was not free to adopt valuation figures higher than those placed on the property by the assessor, even if the higher figures are supported by the evidence. This court stated in *Village of Aurora v. Commissioner of Taxation*, 217 Minn. 64, 14 N.W.2d 292 (1944), that the district court is restricted to a consideration of whether the assessment should be sustained or lowered; the court is not free to increase the assessed valuation. Furthermore, Minn.Stat. § 278.-07 (1978) sets out judgment procedures to be followed in cases challenging real property taxes if the tax is sustained in the full amount levied or if it is determined that the taxpayer owes less than the amount levied. Section 278.07 makes no provision for cases in which the tax owed is determined to be greater than the amount levied.

We therefore remand this case to the trial court for reconsideration of its valuation findings in light of our determination that the court is not free to adopt valuation figures higher than those placed on the property by the assessor.

▮▮ Two final points should be noted in the Northwest Airlines case. First, our decision that Minn.Stat. § 273.11, subd. 2, is constitutional makes it unnecessary to decide whether, in the context of the statutory discrimination issue, the Metropolitan Airports Commission constitutes the proper taxing district for purposes of valuation comparisons. Second, there appears to be some confusion as to whether the trial court included machines and equipment located within Northwest's test cells in its valuation of Parcel 8000. We agree with Northwest's position that the machinery and equipment located within the test cell shell is personal property which is exempt from real property taxes, although the shell itself is subject to taxation. The state's expert witness and the assessor may have improperly included some of the equipment in their appraisals. However, the trial court based its findings on the basic reproduction cost figures supplied by Northwest's expert, Mr. Shenehon, and stated that it did so because there was a possibility that other experts had improperly included personal property in their appraisals. Therefore, we are confident that the trial court did not include the test cell equipment in its original calculations and that it will not do so on remand.

Affirmed in part, and remanded with instructions.

## APPENDIX

Valuation estimates for Northwest Airlines' property 1972-1975

I. Appraisals made by Commissioner of Revenue

| | | | |
|---|---|---|---|
| 1972: | Parcel 8000 | Land: | $ 1,562,400 |
| | | Bldg: | 34,354,000 |
| | | Total: | 35,916,400 |
| | Parcel 8010 | Land: | 660,300 |
| | | Bldg: | 3,012,500 |
| | | Total: | 3,672,800 |
| 1973: | Parcel 8000 | Land: | 1,953,000 |
| | | Bldg: | 32,938,800 |
| | | Total: | 34,891,800 |
| | Parcel 8010 | Land: | 830,100 |
| | | Bldg: | 2,801,100 |
| | | Total: | 3,631,200 |
| 1974: | Parcel 8000 | Land: | 1,953,000 |
| | | Bldg: | 32,938,800 |
| | | Total: | 34,891,800 |
| | Parcel 8010 | Land: | 830,100 |
| | | Bldg: | 2,801,100 |
| | | Total: | 3,631,200 |
| 1975: | Parcel 8000 | Land: | 2,929,500 |
| | | Bldg: | 32,938,800 |
| | | Total: | 35,868,300 |
| | Parcel 8010 | Land: | 1,193,200 |
| | | Bldg: | 2,801,100 |
| | | Total: | 3,994,300 |

II. Findings of the trial court

| | | | |
|---|---|---|---|
| 1972: | Parcel 8000 | Land: | 1,584,000 |
| | | Bldg: | 32,606,000 |
| | | Total: | 34,190,000 |
| | Parcel 8010 | Land: | 765,375 |
| | | Bldg: | 3,032,000 |
| | | Total: | 3,797,375 |
| 1973: | Parcel 8000 | Land: | 1,632,000 |
| | | Bldg: | 31,629,000 |
| | | Total: | 33,261,000 |
| | Parcel 8010 | Land: | 788,000 |
| | | Bldg: | 2,941,000 |
| | | Total: | 3,729,000 |
| 1974: | Parcel 8000 | Land: | 1,632,000 |
| | | Bldg: | 31,629,000 |
| | | Total: | 33,261,000 |
| | Parcel 8010 | Land: | 788,000 |
| | | Bldg: | 2,941,000 |
| | | Total: | 3,729,000 |
| 1975: | Parcel 8000 | Land: | 1,731,000 |
| | | Bldg: | 38,301,000 |
| | | Total: | 40,032,000 |
| | Parcel 8010 | Land: | 836,000 |
| | | Bldg: | 3,330,000 |
| | | Total: | 4,166,000 |

III. <u>Appraisals made by expert witness</u> Robert Boblett

| 1972:(Total of land and buildings for both parcels) | $14,500,000 |
|---|---|
| 1973: | 15,000,000 |
| 1974: | 15,500,000 |
| 1975: | 16,000,000 |

IV. <u>Appraisals made by expert witness</u> Howard Shenehon

| 1972: | $18,000,000 |
|---|---|
| 1973: | 18,500,000 |
| 1974: | 18,000,000 |
| 1975: | 18,500,000 |

AMDAHL, J., not having been a member of this court at the time of argument and submission, took no part in the consideration or decision of this case.