UNITED NATIONAL CORPORATION,
Relator,

v.

COUNTY OF HENNEPIN, Respondent.

No. 49998.

Supreme Court of Minnesota.

May 30, 1980.

Maun, Green, Hayes, Simon, Murray & Johanneson, John A. Murray and Richard M. Gaalswyk, St. Paul, for relator.

Thomas L. Johnson and John M. Gendler, County Attys., Minneapolis, for respondent.

SHERAN, Chief Justice.

This appeal challenging an assessment of real estate taxes upon a property located in St. Louis Park, Minnesota, for the years 1975–77, arises from a writ of certiorari by petitioner United National Corporation following a trial on the merits before the Minnesota Tax Court. The tax court accepted petitioner's contention that the property at issue had been improperly assessed at greater than its market value, reducing the valuation for each of the years in issue by almost $1,000,000, but concluded that the facts did not support an allegation of unequal assessment under the statutes and constitution of the State of Minnesota or the United States Constitution. Petitioner appeals that latter determination. We affirm the decision of the trial court.

During a period which included the years 1975, 1976 and 1977, petitioner United National Corporation owned and operated under a long-term lease a property in St. Louis Park known as Knollwood Plaza. For the purpose of real estate tax assessments, the property was valued during the years in question at approximately $5.5 million. In 1978, petitioner sold its long-term, leasehold interest for approximately $4.9 million, and thereafter contested tne 1975, 1976 and 1977 appraisals. The tax court, while recognizing that sales price is often determinative of market value, found the evidence of sales price in this particular case inconclusive and utilized a number of other factors in computing the market value of the property. The court concluded that the correct market value of the property on the date of assessment in 1975 was $4.6 million, $4.5 million for 1976 and $4.5 million in 1977, and ordered a recomputation of real estate taxes consonant with that finding.

In attempting to prove its second claim of unequal assessment, petitioner commis-

sioned a study chronicling sales of commercial property in St. Louis Park during the years in question that served as the sole basis for its assertion of unequal assessment. The study, based on data obtained from the St. Louis assessor's office, identified 38 commercial properties sold in St. Louis Park between 1975 and 1977. That data, reflecting eight sales in 1975, twenty-five in 1976, and five in 1977, documented the price at which each property sold and the assessor's market valuation for the years before and after the sales. The information from the assessor's office was not a complete chronicle of property transfers in St. Louis Park during those years, since it listed only one sale in January for 1975 with the remaining sales occurring in the latter half of the year, and included sales for only the first six months of 1977.

The study utilized a ratio of pre-sale assessed value and sales price to post-sale assessed value and sales price, purportedly to demonstrate whether the assessor overvalued or undervalued the properties. In computing the ratios, the study assumed that sales price equaled market value, although many factors can render such assumptions invalid. At trial, petitioner acknowledged the importance of knowing the terms of a sale "if you're going to use it as a comparable sale," but made no attempt in the study to verify the sales price of the properties examined.

Petitioner, in pressing its claim of discrimination, wished to prove that its property was overvalued in relation to other properties. Computing the percentage of assessed value to sales price, the study labeled as "substantially undervalued" every property with a percentage of less than 100 percent, including properties with ratios of 94 and 98 percent; however, it defined properties with ratios of 106 percent as "slightly overvalued." The study thus established two categories for overvaluation but only one for undervaluation. Nor did it weight the figures to account for differences in value, but merely averaged the ratios where the application of a statistical mean would have perhaps been more illustrative.

Following the close of trial and again after the motion for amended findings or a new trial, the tax court found the evidence insufficient to establish a "discernible pattern of systematic undervaluation of other properties." The principal issue raised on appeal is whether the data presented in the study commissioned by petitioner raise a presumption that the property at issue here was assessed at a level violative of petitioner's rights under the federal and state constitutions [1] and the relevant statutes of the State of Minnesota.[2] Petitioner also raises the argument that the statutory provision, Minn.Stat. § 278.01 (1978), establishes a less rigorous burden than what would otherwise be required to sustain a claim for relief under the federal and state constitutions.

█ In the leading case of *Hamm v. State*, 255 Minn. 64, 70, 95 N.W.2d 649, 654–55 (1959), this court declared: "discrimination in the imposition of the tax burden, resulting from systematic, arbitrary, or intentional undervaluation of some property as compared to the valuation of other property in the same class, violates the uniformity clause of Minn.Const. art. 9, § 1, and the equal-protection clause of U.S.Const. Amend. XIV * * *." Cases subsequent to *Hamm* have sought to isolate an operational standard identifying the factors com-

1. The equal protection clause of the Fourteenth Amendment to the U.S. Constitution provides in relevant part:

No state shall * * * deny to any pυrson within its jurisdiction the equal protection of the laws.

U.S.Const. amend. XIV, § 1.

The uniformity clause of Minn.Const. art. X, § 1 provides in relevant part:

Taxes shall be uniform upon the same class of subjects * * *.

2. Minn.Stat. § 278.01 (1978) provides in relevant part:

Any person having any estate, right, title, or interest in or lien upon any parcel of land, who claims that such property has been *partially, unfairly, or unequally assessed*, * * * may have the validity of his claim, defense, or objection determined by the district court of the county in which the tax is levied or by the tax court * * *. (Emphasis added.)

mon to a situation of unequal assessment. *See Ploetz v. County of Hennepin*, 301 Minn. 410, 223 N.W.2d 761 (1974); *Bethke v. County of Brown*, 301 Minn. 380, 223 N.W.2d 757 (1974); *Johnson v. County of Ramsey*, 290 Minn. 307, 187 N.W.2d 675 (1971); *Dulton Realty, Inc. v. State*, 270 Minn. 1, 132 N.W.2d 394 (1964); *Renneke v. County of Brown*, 255 Minn. 244, 97 N.W.2d 377 (1959). To determine whether a property has been unequally assessed, its actual market value and real estate tax assessment must be compared with the market value and real estate tax assessments of other properties. We view the above cases as holding in effect that a taxpayer will not meet the evidentiary burden of establishing a violation of rights protected under the federal or state constitution, unless he can demonstrate that the disparity about which he complains resulted from the intentional or arbitrary or systematic undervaluation of other properties. In so doing, we note the inconsistency of the observation in *Hamm* that "[t]here must be something which in effect amounts to an intentional violation * * *." 255 Minn. at 70, 95 N.W.2d at 655. Such dictum is inconsistent with our current interpretation of the law and we no longer consider it authoritative.[3] *See* decisions of the Minnesota Tax Court in *Pillsbury Co. v. Comm'r. of Revenue*, No. 2578 (Minn.T.C. 1980); *Northland Land Co. v. County of Dakota*, No. 83469 (Minn.T.C. 1978).

It is undisputed that the valuation afforded to petitioner's property in the case at bar was not intentionally discriminatory. Neither was the valuation arbitrary or systematic, unless a constitutional infringement is established by proving that a valuation corrected to reflect current market value is nevertheless arbitrary or systematic when an examination of available data on commercial real estate sales in the relevant taxing district during the period in question demonstrates that in most instances the sale price of other properties exceeded assessed market value. We do not believe that the evidence in this record would support that conclusion. The study commissioned by petitioner relied on an incomplete list of commercial property sales, assumed incorrectly that sales prices automatically equaled market value, and determined the ratio of sales price to assessed value without verifying the actual value of the properties surveyed.[4] All that can be said is that, with respect to most of the real estate sales of commercial property in the taxing district examined for the period in question, the evidence indicates that the tax assessor might have made an error of judgment.

Petitioner contends, however, that Minn.Stat. § 278.01 (1978), guaranteeing equalized and nondiscriminatory property valuation for purposes of real estate taxation, establishes a separate and less rigorous burden of proof than that embodied by the uniformity clause of the Minnesota Constitution and the equal protection clause of

---

**3.** *Hamm's* reference to something approaching intentional discrimination can be traced to decisions of the United States Supreme Court which require a showing of purposeful discrimination. *See, e. g. Snowden v. Hughes*, 321 U.S. 1, 9, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944). These decisions, however, are not constitutionally compelled but are based on a need for federal-state comity: "if taxpayers could obtain federal court relief for mistakes in judgment by assessors the federal courts could be placed in the position of tax review boards, thus disrupting the state property tax system." Note, *Grounds and Procedures for Attacking Real Property Tax Assessments in Minnesota*, 4 Wm. Mitchell L.Rev. 371, 384 (1978) *citing Southland Mall, Inc. v. Garner*, 455 F.2d 887, 889 (6th Cir. 1972).

Because a showing of purposeful or intentional discrimination is not constitutionally required, many other state courts have interpreted the uniformity clauses of their state constitutions to require merely a lack of reasonably uniform treatment. *Id.* at 386.

**4.** Market value and sales price are not synonymous. Although recent sales of properties of a similar nature are persuasive in determining market value, factors such as sales and holding prices in the area, location, access, age, use, size, type of construction, method of financing and the arm's length nature of a transaction may render any comparisons invalid. *See Minn. Entertainment Enterprises v. State*, 306 Minn. 184, 187, 235 N.W.2d 390, 392–93 (1975); *see also Deitch Co. v. Bd. of Property Assessment*, 417 Pa. 213, 209 A.2d 397, 402 (1965).

the Fourteenth Amendment to the United States Constitution.[5] In pressing the claim that a taxpayer should not be saddled with as heavy a burden to sustain a claim for relief under the statute, petitioner argues that the tax court erred by treating § 278.-01 as merely a statutory embodiment of the relevant provisions of the federal and state constitutions. Rather, petitioner urges that the tax court should have held under a more liberal standard that its study of commercial property sales established a prima facie case of unfairness or discrimination or inequality as those words are used in the statute. The evidence upon which petitioner bases this assertion is summarized in Appendix A to this opinion.

We do not find in the decisions of this court any support for the claim that a dual standard, one constitutional and the other statutory, should be applied in cases of this kind. Neither is there language in our decisions which supports the proposition that disparity between assessed market values and selling prices alone makes a prima facie case of inequality, discrimination or unfairness entitling the taxpayer to relief beyond that which he receives when the assessed valuation of his property is made to conform with its true market value.[6]

It is unnecessary for us at this time to decide whether a more liberal approach than that presently endorsed by this court should be adopted in Minnesota upon either constitutional or statutory grounds. This is so because, for the following reasons, the information contained in petitioner's study did not establish a prima facie case or raise a presumption of unfairness justifying relief: (1) the number of instances examined as compared to the total number of assessed units of commercial property in the taxing district was not a sufficient sample to support reasonable inferences of unfairness or discrimination; (2) nothing in the study or the supporting data underlying it disclosed the particular kinds of property involved or the terms and conditions of sale; and (3) the volatility of the real estate market and the impact of inflation during the period in question make the disparity between assessed valuations and sales prices less significant than would ordinarily be the case.

We are not prepared to say at this time what kind of showing would be adequate to support a prima facie presumption for remedial intervention by this court in situations where the assessed value and the market value are agreed to be in conformity. This will have to be decided when and if such a case is brought before us.[7] Neither can we predict what kind of relief might be accorded if a complaining taxpayer were to establish unequal assessment to a lesser degree of certainty than our decisions presently require.[8] Theoretically, a taxpayer should not be required to pay a greater

5. In clarifying today that a taxpayer need not demonstrate intentional discrimination in the valuation of property for tax purposes to recover under Minn.Stat. § 278.01 (1978), we observe that the requirements under the uniformity clause of the state constitution and the equal protection clause of the federal Constitution are not coterminous.

6. Despite the position taken by appellants at the oral argument that *Kline v. County of Ramsey*, No. TA 27, 30 (Minn.T.C.1979), and *McCannel v. State*, Nos. 695746, 704420, 715294, 725734, 735981, 0028 (Minn.T.C.), *cert. filed* No. 50428 (1979), equated sales price and market value for the purposes of computing the ratios of market value to estimated market value, the relationship between sales price and market value was not raised as an issue in either case, and both cases dealt with residential and not commercial properties.

7. We note in passing that other courts have also acknowledged the difficulty of gathering sufficient data to ensure a representative sales-ratio study. *See Deitch Co. v. Bd. of Property Assessment*, 417 Pa. 213, 209 A.2d 397 (1965).

8. In *Dulton Realty, Inc. v. State*, 270 Minn. 1, 21, 132 N.W.2d 394, 408 (1965), this court found that the appropriate relief from unconstitutional discrimination in the assessment of property taxes was to reduce the valuation of the subject property to the same percentage level as the most undervalued property in the taxing district. Many other jurisdictions merely reduce the taxpayer's assessment to the average percentage at which other property is assessed within the taxing district. *See Note, The Road to Uniformity in Real Estate Taxation: Valuation and Appeal*, 124 U.Pa.L.Rev. 1418, 1446 (1976).

portion of the tax levy imposed by the taxing district than would be his if every piece of property were assessed precisely as it should be. But whether, when a particular assessment is high as compared to the other units of real estate in the taxing district, although not intentionally, arbitrarily or systematically so, other taxpayers should, in effect, profit by the tax assessor's error is a question we need not and do not decide at this time.

Affirmed.

## APPENDIX A

**1975 ST. LOUIS PARK COMMERCIAL SALES AND ASSESSOR MARKET VALUE (AMV) COMPARISON**
(Most of sales were during last 1/2 of 1975)
(After assessment process normally completed for 75/76 taxes assessed as of 1/2/75)
(Before assessment date for 76/77 taxes assessed as of 1/2/76)

| Sale No. | Sale Date | Zoning | AMV (First Year Before Sale) 1975-1976 | Ratio | 1975 Selling Prices | AMV (First Year After Sale) 1976-1977 | Ratio |
|---|---|---|---|---|---|---|---|
| 1 | 8/75 | Comm | $535,000 | 73% | $1,075,000* (725,000 + 350,000) | $820,000 | 76% |
| 2 | 10/75 | Comm | $165,000 | 105% | $156,000 | $165,000 | 105% |
| 3 | 8/75 | Comm | $135,850 | 100% | $135,000 | $136,800 | 101% |
| 4 | 10/75 | Comm | $ 72,740 | 45% | $160,000 | $ 73,900 | 46% |
| 5 | 1/75 | Comm | $ 16,280 | 48% | $ 33,500 | $ 17,200 | 51% |
| 6 | 10/75 | Comm | $1,798,300 | 90% | $1,985,000 | $1,800,000 | 90% |
| 7 | 12/75 | Comm | $ 34,100 | 75% | $ 45,000 | $ 36,000 | 80% |
| 8 | 12/75 | Comm | $ 77,330 | 85% | $ 90,000 | $ 85,000 | 94% |

* $725,000 selling price plus $350,000 improvement cost immediately after sale during year of sale per assessor records. Accordingly, the "year before" ratio is 73% (535,000 ÷ 725,000) & the "year after" ratio is 76% ($820,000 ÷ 1,075,000).

### RECAP SUMMARY OF 1975 COMMERCIAL SALES RATIOS (St. Louis Park)

| Last Year Before Sale (as of 1/2/75) | First Year After Sale (as of 1/2/76) | Undervaluation Pattern Averages |
|---|---|---|
| 2 slightly overvalued at 102.5% average (100 to 105% range) | 2 slightly overvalued at 103% average (101 to 105% range) | 69% (before sale) |
| 6 substantially undervalued at 69% average (45 to 90% range) | 6 substantially undervalued at 72% average (46 to 94% range) | 72% (after sale) |
| | | 71% average for 75% of transactions |

**1976 ST. LOUIS PARK COMMERCIAL SALES AND ASSESSOR MARKET VALUE (AMV) COMPARISON**
(Sales occurred throughout entire year of 1976)
(After assessment processed had been fully completed for 75/76 taxes assessed as of 1/2/75)
(During entire time when assessment process was occurring for 76/77 taxes assessed as of 1/2/76)
(Before assessment date for 77/78 taxes assessed as of 1/2/77)

| Sale No. (Chronological Sequence) | Sale No. (Initial designation when received) | Sale Date | Zoning | AMV 1975-1976 | Ratio | Selling Price | AMV 1976-1977 | Ratio | AMV 1977-1978 | Rat |
|---|---|---|---|---|---|---|---|---|---|---|
| a | 9 | 1/76 | Comm | $146,080 | 72% | $202,000 | $170,000 | 84% | $180,800 | 89% |
| b | 13 | 3/76 | Comm | $ 11,400 | 114% | $ 10,000 | $ 11,400 | 114% | $ 13,600 | 136% |
| c | 18 | 3/76 | Comm | $ 58,400 | 106% | $ 55,000 | $ 58,400 | 106% | $ 80,000 | 145% |
| d | 4 | 3/76 | Comm | $125,700 | 67% | $185,000 | $125,700 | 67% | $160,000 | 86% |
| e | 16 | 4/76 | Comm | $ 15,150 | 45% | $ 33,000 | $ 16,600 | 50% | $ 28,000 | 84% |
| f | 15 | 4/76 | Comm | $ 64,050 | 71% | $ 90,000 | $ 64,000 | 71% | $ 45,000 | 50% |
| g | 5 | 4/76 | Comm | $ 76,600 | 84% | $ 91,000 | $ 70,600 | 84% | $100,000 | 109% |
| h | 22 | 5/76 | Comm | $ 92,950 | 40% | $230,000 | $132,800 | 57% | $234,700 | 102% |
| i | 3 | 5/76 | Ind. | $144,100 | 93% | $153,800 | $138,200 | 89% | $187,200 | 121% |
| j | 8 | 6/76 | Comm | $248,000 | 84% | $293,343 | $248,000 | 84% | $315,000 | 107% |
| k | 1 | 7/76 | R-4 B-2 | $ 47,400 | 77% | $ 61,500 | $ 47,400 | 77% | $ 80,000 | 130% |
| l | 7 | 7/76 | Ind | $ 49,200 | 69% | $ 71,000 | $ 49,200 | 69% | $ 69,700 | 98% |

| | No. | Sale Date | Zoning | AMV | Ratio | | AMV | Ratio | AMV | Ratio |
|---|---|---|---|---|---|---|---|---|---|---|
| m | 25 | 7/76 | Comm | $144,320 | 78% | $185,000 | $150,000 | 81% | $196,800 | 106% |
| n | 23 | 8/76 | B-2 | $24,600 | 74% | $33,100 | $24,600 | 74% | $30,000 | 90% |
| o | 12 | 8/76 | Comm | $115,600 | 70% | $150,000 | $115,600 | 70% | $140,000 | 93% |
| p | 20 | 8/76 | Comm | $160,500 | 160% | $100,000 | $160,500 | 160% | $166,000 | 166% |
| q | 21 | 9/76 | Comm | $56,300 | 139% | $40,500 | $56,500 | 139% | $90,000 | 222% |
| r | 17 | 9/76 | Ind. | $162,400 | 71% | $227,500 | $162,500 | 71% | $217,500 | 95% |
| s | 10 | 9/76 | Comm | $333,740 | 189% | $175,800 | $371,600 | 211% | $130,700 | 74% |
| t | 6 | 10/76 | Ind. | $52,800 | 38% | $136,365 | $58,000 | 42% | $75,000 | 54% |
| u | 14 | 11/76 | Comm | $16,510 | 50% | $32,600 | $18,160 | 55% | $35,400 | 108% |
| v | 11 | 11/76 | Comm | $100,500 | 85% | $117,000 | $100,500 | 85% | $104,000 | 88% |
| w | 19 | 12/76 | Comm | $35,500 | 51% | $69,000 | $39,000 | 56% | $60,000 | 86% |
| x | 24 | 12/76 | B-2 | $520,000 | 91% | $571,000 | $493,000 | 86% | $512,600 | 89% |
| y | 2 | 12/76 | Comm | $1,400,000 | 93% | $1,500,000 | $1,400,000 | 93% | $1,568,600 | 104% |

RECAP SUMMARY OF 1976 COMMERCIAL SALES RATIOS (St. Louis Park)

Last Year (75/76) "Before" Year of Sales (Assessed as of 1/2/75)
1 slightly overvalued at 106% average
3 substantially overvalued at 137% aver. (114 to 160% range)
20 substantially undervalued at 70% aver. (38 to 93% range)
24

Year 76/77 "during which" sales occurred (Assessed as of 1/2/76)
1 slightly overvalued at 106% average
3 substantially overvalued at 137% aver. (114 to 160% range)
20 substantially undervalued at 72% aver. (42 to 93% range)
24

First Year (77/78) "after" all sales (Assessed as of 1/2/77)
6 slightly overvalued at 106% average. (101 to 109% range)
6 substantially overvalued at 159% aver (121 to 222% range)
13 substantially undervalued at 83% aver (50 to 98% range)
25

Undervaluation Pattern Averages
70% (before sale)
72% (year of sale)
83% (after sale)
75% average for undervalued transactions which comprise approximately 60 to 80% of all sales that year.

1977 ST. LOUIS PARK COMMERCIAL SALES AND ASSESSOR MARKET VALUE (AMV) COMPARISON
(All of sales were during first 1/2 of 1977)
(After assessment process had been completed for 76/77 taxes assessed as of 1/2/76)
(Before assessment process had closed for 77/78 taxes assessed as of 1/2/77)

| Sale No. | Sale Date | Zoning | AMV (Second Year Before Sale) 1975-1976 | Ratio | AMV (First Year Before Sale) 1976-1977 | Ratio | 1977 Selling Price | AMV (First Year After Sale) 1977-1978 | Ratio |
|---|---|---|---|---|---|---|---|---|---|
| 2* | 2/77 | Comm | $146,900 | 182% | $146,900 | 182% | $80,670 | $168,000 | 208% |
| 3 | 5/77 | B-2 | | | | | $865,000 | $600,000 | 69% |
| 4 | 1/77 | Comm | $231,600 | 88% | $231,600 | 88% | $261,290 | $243,300 | 93% |
| 5 | 1/77 | Comm | $108,000 | 69% | $108,000 | 69% | $155,000 | $126,800 | 81% |
| 6 | 6/77 | I-2 | $66,900 | 59% | $66,900 | 59% | $112,000 | $90,000 | 80% |

RECAP SUMMARY OF 1977 SALES RATIOS (St. Louis Park)

Last Year Before Sale (as of 1/2/76)
1 substantially overvalued at 182% average
1 unknown (assessor records not available)
3 substantially undervalued at 72% average
5

First Year After Sale (as of 1/2/77)
1 substantially overvalued at 208% average
4 substantially undervalued at 81% average
5

Undervaluation Pattern Averages
72% (before sale)
81% (after sale)
76.5% average for 80% of transactions

* Sale No. 1 was erroneously furnished (i.e., a 1973 sale, mislabeled)