Kenneth H. ANACKER et al, Appellants,

v.

COUNTY OF COTTONWOOD et
al, Respondents.

No. 50703.

Supreme Court of Minnesota.

Jan. 9, 1981.

Piper, Sunde, Olson & Wolf and Steven R. Sunde, St. James, for appellants.

Bruce F. Gross, County Atty., Windom, for respondents.

SIMONETT, Justice.

Dissatisfied with the manner in which their agricultural land had been assessed in 1978, some 50 farmers in Cottonwood County brought this action under Minn.Stat. § 278.01 (1980). The district court held the tax zoning plan devised by the county assessor was valid and complied with the statutory requirements of Minn.Stat. §§ 273.11 and 273.12 (1980), the uniformity clause of the Minnesota Constitution, and the equal protection clause of the United States Constitution. The taxpayers appeal and we affirm.

Because of historical assessment practices and recent leaps in land values, it has been difficult for county assessors and boards of equalization to reduce assessment disparities and to comply with the statutory mandate that "all property shall be valued at its market value." Twice in 3 years prior to the 1978 assessments, Cottonwood County had its valuations overturned by the State Board of Equalization. The Cottonwood County Assessor, Victor M. Faust, was also aware of the assessment dispersion penalty,

which reduces state aid to local governments in proportion to the degree of nonuniformity in their assessments. See Minn. Stat. § 477A.04 (1980). Consequently, Faust developed his 1978 Farm Land Assessment Classification and Valuation Plan. The parties here have agreed to proceed first with Mr. and Mrs. Kenneth H. Anacker's case on the limited issue of whether the assessment method used by the county assessor, the Plan, was proper.

The Plan, set out in a nine-page manual, first classifies tillable land into grades, based on quality of soil and drainage. The 18 townships of the county are then divided into three zones: Zone I, on the east, comprising four townships; Zone II, in the middle, consisting of nine townships; and Zone III, on the west end of the county, with five townships. The Plan next assigns a range of values per acre for each grade of land in each zone. The easternmost zone has the highest price range and the westernmost zone the lowest. Some overlap in price ranges exists between Zones I and II and Zones II and III, but no overlap exists in price range for the same grade of land between Zones I and III. For example, best grade A land is valued in Zone I at $1,130 to $1,250 an acre, in Zone II at $1,050 to $1,165, and in Zone III at $975 to $1,080.

Under the Plan, the township assessor views the land in his township and gives it a grade, taking into consideration the various features required under state law such as drainage, land contour and the like; he then gives each tract a value per acre within the price range set by the Plan for that particular zone. The Plan applies only to land used for agriculture; it does not cover buildings or fixtures.

In allocating townships to a zone and setting the range of value for the grades of land in each zone, Faust considered a variety of factors, including soil capability, average rainfall, fencing, quality of roads and assessed land values in adjacent counties. He relied primarily, however, on a Farm Sales Ratio Study.

This Study was derived from a record of comparable sales in the county for the peri-

od July 1, 1975, to July 1, 1977. It was produced this way: From the county recorder's office, Faust obtained notice of all land sales, the legal description, size of tract, names of buyer and seller, the price paid, and some of the financing terms. The assessor's records provided soil measurements to indicate the grade of farmland sold. Sales that were not at arm's length or had unusual financing arrangements were discarded. The absolute size of the property sold and the proximity of other land owned by the same buyer were not considered. No one from Faust's office looked at the land or talked to the buyer or seller. With this information, Faust computed a price per acre for each sale and classified the sales according to grade of land in every township. This gave an indication of what land was selling for in the county, its fair market value.

The Farm Sales Ratio Study compared the accuracy of assessments for comparable land in each township by taking the sales price of a tract of land sold in a particular township and comparing the price to the assessed value previously assigned the tract. A ratio was obtained by dividing the assessed value by the sales price. This ratio was then compared to that for land of the same grade sold in other townships. For instance, if Jones' land was assessed at $100,000 in 1977 and sold for $150,000 in 1978, the sales ratio would be 66⅔ percent. If Jones' land was grade A, it was compared with sales of grade A land in other townships.

The study for 1977 revealed great unevenness in assessments across the county. Land in Selma Township (in Zone I in the easternmost part of the county) was assessed at 47.6 percent of fair market value; land in Dale Township (Zone II) was assessed at 69.43 percent; and in Westbrook Township (Zone III, the westernmost part of the county), land was assessed at 92.11 percent of its market value. To achieve an assessed value equal to market value in all these townships would have required raising the average assessment in each by a different value—by 52.4 percent in Selma, 30.57 percent in Dale, and only 7.89 percent

in Westbrook. The accuracy of assessments does not merit such fine tuning. *Accord, Johnson v. County of Ramsey*, 290 Minn. 307, 312, 187 N.W.2d 675, 678 (1971). Instead, Faust chose to raise assessed values 25 percent in Zone III, 35 percent in Zone II, and 45 percent in Zone I. These raises were incorporated into the price ranges in the Plan, with the result that the sales ratio in all 18 townships ranged from 86.7 percent to 98.3 percent. The Plan was ready for its first use in 1978.

Plaintiffs Anacker own 240 acres in Selma and 80 acres in Midway, both townships in Zone I. Their best grade A land in Selma was assessed under the Plan at $1,250 an acre. A few miles away, in adjoining Delton Township, similar best grade A land was assessed within a lower per acre price range because Delton was in Zone II. For many years, Mr. Anacker had worked on farms in Delton, and he testified the land there is equal to or better than his own in Selma, yet the Delton land received a smaller increase in assessed values than Selma. This meant, said Anacker, that farmers were paying about 60 cents an acre less in taxes for best grade A land in Delton than he was paying for the same grade land in Selma. Anacker contends this is unfair. He asserts the reason Delton was put in Zone II rather than Zone I was because there were no land sales in Delton for the period of the Farm Sales Ratio Study, which prevented the study from reflecting fully a rise there in land market values. A number of farmers who owned land in two or more townships in different zones appeared for Anacker, all of them testifying to no difference in the quality of their parcels.

■ Plaintiffs first contend the Plan violates the uniformity clause of the state constitution and the equal protection clause of the federal constitution. Specifically, they assert the Plan is arbitrary in its methods and in its assumption that assessments can differ on an average basis according to township lines, and that it results in intentional and systematic inequality. Analyti-

cally, plaintiffs' claim is one of discrimination in fact. *In the Matter of the Petition of Malcolm A. McCannel*, 301 N.W.2d 910 at ——, —— (Minn.1980) filed September 5, 1980, sl. op. at 8, 14. To make out a case, plaintiffs must demonstrate unequal assessment; to complete it, they must demonstrate the complained of inequality exists within the relevant taxing district, be it town, village or school district. *Renneke v. County of Brown*, 255 Minn. 244, 248, 97 N.W.2d 377, 380 (1959).

■ "To determine whether a property has been unequally assessed," this court has recently stated, "its actual market value and real estate tax assessment must be compared with the market value and real estate tax assessments of other properties." *United National Corporation v. County of Hennepin*, 299 N.W.2d 73 at 76 (Minn.1980). Citing a number of decisions, we continued:

> We view the above cases as holding in effect that a taxpayer will not meet the evidentiary burden of establishing a violation of rights protected under the federal or state constitution, unless he can demonstrate that the disparity about which he complains resulted from the intentional or arbitrary or systematic undervaluation of other properties.

*Id.* at 76. Hence, it is not enough to show parcels near to each other, even if similar, were given different assessed values. It is not enough simply to compare these assessed values. Rather, the proportion the actual market value of plaintiffs' parcel bears to its assessed value must be compared with the proportions these two values bear for other properties; these other properties must be within the same taxing district as plaintiffs'; and it must be shown thereby that an arbitrary or systematic undervaluation of these other properties exists.

■ Here, we have no evidence of the actual market value of plaintiffs' land nor of the actual market value of other properties to compare with the assessor's values.

Melvin Simon, one of plaintiffs' witnesses, owns 160 acres of farmland in Delton Township and 160 acres in Selma. He testified the land in both townships was of the same quality but gave no opinion as to market values. He did say his taxes on the Selma tract were $2,067.72 and $1,904.24 on the Delton tract, a difference of about a dollar an acre. Anacker had testified to a tax difference of 60 cents an acre. But this kind of proof is no help. Inequality cannot be demonstrated without figures for actual market values to compare with assessed values. To go one step further, there is no showing other lands in plaintiffs' township, the taxing district, are undervalued, nor, for that matter, that other lands county-wide have been undervalued. *Johnson v. County of Ramsey*, 290 Minn. 307, 187 N.W.2d 675 (1971); *In re Petition of Dulton Realty, Inc. v. State*, 270 Minn. 1, 20, 132 N.W.2d 394, 407 (1964). There being no showing of any arbitrary or systematic undervaluation of other properties as compared to plaintiffs' property, plaintiffs have failed to substantiate their claim of constitutional inequality.

■ This leads to plaintiffs' second contention, that the Plan is without a statutory imprimatur; that it does not conform to statutory requirements in that Faust did not give due consideration to the factors affecting land values as required by Minn. Stat. §§ 273.11(1) and 273.12 (1980); and that Faust set price ranges for the land parcels without actually viewing the land, contrary to Minn.Stat. § 273.08 (1980).

The validity of an assessment is presumed as a matter of law unless a taxpayer makes an affirmative showing to the contrary. Minn.Stat. § 272.06 (1980). But here again, even should the taxpayer show an assessor failed to observe proper standards or procedures, no relief is available unless the taxpayer proves he was prejudiced thereby. Minn.Stat. § 279.19 (1980); *see also* Minn. Stat. § 272.06 (1980); *Lindahl v. State*, 244 Minn. 506, 510–13, 70 N.W.2d 866, 870–71 (1955). To sustain their case, plaintiffs must prove their property was either unequally assessed or overvalued. Minn.Stat. § 278.01 (1980).

As already observed, plaintiffs have made no showing of unequal assessment. Nor has there been any evidence adduced that their property has been assessed in excess of its fair market value. Neither in their pleadings nor at trial did the Anackers contend the value of their land was other than as assessed. Having shown neither overvaluation nor unequal assessment, plaintiffs' statutory claims must likewise fail. We so hold.

■ Even had plaintiffs made out a prima facie case, we cannot say the Plan would be found to violate applicable statutes. Faust devised his Plan under what he believed was his "inherent statutory authority." Minn.Stat. § 273.12 (1980) sets out the duties of an assessor and the factors to consider in determining the value of lands for tax purposes. The evidence does not show any failure to observe the statutory requirements. Both the county and local assessors participate in the Plan. The county assessor sets the price ranges in each zone, while the local assessor determines the grade into which each parcel goes and what value, within the established price ranges, it should have. The Plan has a variety of grades with a price range for each, with the price ranges overlapping between adjoining zones, thus giving the local assessor ample latitude. The Plan stresses the local assessor is to view the property and exercise his own judgment within the guidelines provided in the manual. For example:

It is to be expected that the Assessor will discuss the matter of Land Classification and value with the owner of the land or, in the case of absentee owners, the renter. The different classifications and suggested values should be explained. By working together, it should then be a simpler matter to judge the number of acres in each classification together with appropriate values for same.

\* \* \* \* \* \*

No set of directions is exacting enough so as to allow them to be followed blindly. Careful study and sound judgment is still necessary.

Nothing in § 273.12 or any other statute precludes the assessor from using a plan such as the one here, so long as the statutory and constitutional mandates are followed.

■ The creation of a sales ratio study is already required of county assessors for use by the State Board of Equalization. The taxpayer argues that the Sales Ratio Study is based on an inadequate sampling of sales, at least in some townships, pointing out Faust had only one comparable sale in Mountain Lake Township and none in Delton, while there were eleven sales in Selma. The 1977 Real Estate Assessments/Sales Ratio Study, published by the Minnesota Department of Revenue, recommends on page 14 that where there is an inadequate sampling of sales for a particular area the assessor should supplement the sampling with sales outside the study period, and, if need be, approximate the market value of selective parcels with appraisals as if a sale were made. Faust did consider sales patterns both after and before his study period where sales during the period were lacking; for example, he used a sale made in Delton Township in December 1977. The county also called as a witness William Weber, an appraiser, who, in early 1979, had made a study of comparable sales for a client who was contemplating a possible pipeline through the county. Weber found that similar properties were selling at a higher price in the eastern part of the county than they were in the western part. It cannot be said on this record Faust's Sales Ratio Study was inadequate or, if it was in some respects, that it caused any arbitrary or systematic undervaluation of property.

Starting in 1980, county assessors were to be held to the same degree of accountability as local assessors for disparities in assessments under the Assessment Dispersion Penalty, Minn.Stat. § 477A.04 (1978), which penalizes townships and counties alike.[1] When Faust raised land values by different

1. The deadline was extended to 1982 in a later amendment. Minn.Stat. § 477A.04 (1980). Of course, Faust did not know this at the time he instituted the Plan.

percentages in Zones I, II and III, he did so to compensate for differences in assessments revealed by the Sales Ratio Study. That Study showed that land in, for instance, Zone II was assessed at a price much closer to its true market value than land in Zone I, requiring prices in Zone I to be increased more to equalize the tax burden. Without these measures, the county might well have been penalized for the disparities in subsequent years.

The situation here described demanded immediate and effective equalization of rates across the county. The trial court found that the Plan used by the county assessor to equalize the standard of land valuation in the county was a reasonable and effective method of obtaining an assessed valuation more closely approximating fair market value of the real estate assessed. We agree.

Affirmed.