### In re OBJECTION TO REAL PROPERTY TAXES

**Marion D. SHORT, legal Representative of the estate of Robert E. Short, deceased, Respondent (CX–82–1001),**

and

**3030 Drew Company, Respondent, (CX–82–1337),**

v.

**COUNTY OF HENNEPIN, Relator.**

Nos. CX–82–1001, CX–82–1337.

Supreme Court of Minnesota.

July 13, 1984.

Thomas L. Johnson, Hennepin County Atty., Robert T. Rudy, Asst. County Atty., Minneapolis, for appellant.

Ralph Peterson, Todd H. Johnson, Minneapolis, for Short.

Benjamin J. Smith, John R. Stoebner, Minneapolis, for 3030 Drew Co.

WAHL, Justice.

We have consolidated these cases on appeal. The central issue in each case is whether the assessment/sales ratio studies (hereinafter sales ratio studies) prepared by the Department of Revenue for the Minnesota Tax Court may be used to establish a *prima facie* case of unequal assessment.

The petitioners, two apartment building owners, sought review of real estate taxes pursuant to Minn.Stat. § 278 (1982). Robert E. Short (hereinafter Short) challenged the assessor's valuations of Calhoun Towers for the years 1976–80, and, for 1980, alleged unequal assessment. Finding for the taxpayer, the tax court lowered the assessments for the contested years and found unequal assessment for 1980. Hennepin County appeals the 1976 market value determination and the finding of unequal assessment based on the tax court's usage of the 1980 sales ratio study. 3030 Drew Company (hereinafter 3030 Drew)

challenged the assessor's valuations of The Apartments at West Lake for the years 1977–81 and, for 1979–81, alleged unequal assessment. The tax court found for the taxpayer in this case, also, lowering the assessments for the contested years and finding unequal assessment for 1979–81. Hennepin County does not appeal the tax court's market value determinations but raises three challenges to the tax court's use of the sales ratio studies. We affirm the decision of the tax court in each case.

The Short property, Calhoun Towers, is a 22-story apartment building located in Minneapolis on the west side of Lake Calhoun. Robert Short, now deceased, purchased the property in 1968. Short submitted five separate petitions for review to the tax court, requesting review of the assessor's estimated market values as follows:

| | |
|---|---|
| January 2, 1976 | $4,000,000 |
| January 2, 1977 | $4,150,000 |
| January 2, 1978 | $4,400,000 |
| January 2, 1979 | $5,700,000 |
| January 2, 1980 | $7,795,000 |

Short also claimed in the petition for the year 1980 that Calhoun Towers had been assessed unequally for tax purposes in comparison to other similar properties of the same class in the same taxing district. The tax court consolidated the petitions and tried the matter on the merits. To support his claim of overassessment, Short presented real estate appraisal expert Robert Strachota. In detailed testimony, Strachota explained the facts and the judgments required to value the property under the cost, market and income approaches.[1] The tax court found the assessor's estimated market values to be in excess of the property's actual market value and directed Hennepin

County to change its records to the following corrected values and to issue a refund or credit with interest from the original dates of payment:

| | |
|---|---|
| January 2, 1976 | $3,400,000 |
| January 2, 1977 | $3,600,000 |
| January 2, 1978 | $4,000,000 |
| January 2, 1979 | $4,400,000 |
| January 2, 1980 | $4,800,000 |

To support his unequal assessment claim for 1980, Short introduced the 1980 Assessment/Sales Ratio Study for Apartment Properties, prepared by the Department of Revenue for the Minnesota Tax Court. That study showed, and the tax court found, that apartment property in the City of Minneapolis for 1980 had been valued by the assessor at approximately 86% of market value. Finding that Short's property, if it were valued at 100% of market value, would be substantially overvalued in comparison with other property of the same class within the same taxing district, the tax court reduced by 14% the 1980 value from $4,800,000 to $4,128,000. On appeal, Hennepin County claims that the tax court's market value determination for 1976 of $3,400,000 was in error where (a) the judicially determined valuation for 1975 was $3,600,000, *In re McCannel*, 301 N.W.2d 910 (Minn.1980), and (b) the tax court in the instant matter found a "constantly rising market for rental real estate properties during this period of time." Hennepin County also claims that the ratio studies, where the sales prices are not adjusted for the terms of the sale or the time that the sales takes place, can not be used to establish a *prima facie* case of unequal assessment.

The 3030 Drew property, the Apartments at West Lake, is a 182-unit apartment

---

**1.** Under the "cost approach," one determines the cost of constructing the building and subtracts an amount for depreciation to determine the building's present value and then adds the value of the underlying land. Under the "income approach," one determines the income that the property should reasonably be expected to generate, subtracts the expenses that should reasonably be incurred, and capitalizes this net "economic" income at a rate of capitalization which investors would reasonably expect to obtain. Under the "market data approach," one surveys the market to determine if there have been a sufficient number of recent voluntary sales of similar property to provide dependable information as to the selling rate of "comparable property." *Northerly Centre Corp. v. County of Ramsey,* 311 Minn. 335, 337–38, 248 N.W.2d 923, 925, n. 2 (1976). Note, Grounds and Procedures for Attacking Real Property Tax Assessments in Minnesota, 4 Wm. Mitchell L.Rev. 371, 379–81 (1978).

building located at 3031 Ewing Avenue South in Minneapolis. The building was completed in 1973. 3030 Drew submitted individual petitions for review to the tax court, requesting review of the following assessor's estimated market values:

| January 2, 1977 | $2,876,000 |
| January 2, 1978 | $3,000,000 |
| January 2, 1979 | $4,500,000 |
| January 2, 1980 | $5,200,000 |
| January 2, 1981 | $5,720,000 |

3030 Drew also claimed in its petition for the years 1979–81 that the property had been unequally assessed in comparison with other real property in the taxing district. The tax court consolidated the petitions and conducted the trial below. Based on the evidence presented, the tax court ordered Hennepin County to change the estimated market values to:

| January 2, 1977 | $2,700,000 |
| January 2, 1978 | $2,850,000 |
| January 2, 1979 | $3,500,000 |
| January 2, 1980 | $4,000,000 |
| January 2, 1981 | $4,500,000 |

Additionally, the tax court ordered Hennepin County to issue a refund or credit for excess taxes paid, plus interest from the original dates of payment, together with 3030 Drew's costs and disbursements. To support its unequal assessment claim, 3030 Drew introduced 1979 and 1980 sales ratio studies to establish a *prima facie* case. During the trial, the tax court advised the parties that as a matter of practice it takes judicial notice of the ratio studies and that it would determine the unequal assessment issue on the weighted ratio basis used by the tax court in *Gamble Development Co. v. County of St. Louis*, File Nos. 135535, 137374, 139189, 141182, 142901 (Minn.T.C. July 20, 1981).[2] Using ratio studies derived from a comparison of all properties of all classes within Hennepin County, the tax court determined that the property had

been unequally assessed in 1979, 1980 and 1981 and ordered that the market values be reduced by 15%, 12% and 11% respectively.

Relator Hennepin County raises these issues on the combined appeals:

1. May the assessment/sales ratio studies prepared by the Commissioner of Revenue for the tax court be used to establish a *prima facie* case of unequal assessment?

2. Did the tax court in 3030 Drew err in using the assessment/sales ratio derived from a comparison of all properties of all classes within the taxing district or within the county in determining the claim of unequal assessment?

3. Did the tax court in 3030 Drew err in taking judicial notice of the 1981 assessment/sales ratio study prepared by the Department of Revenue which was not offered into evidence by either party?

4. Did the tax court err in finding the market value of the Short property in 1976 to be lower than the market value judicially determined for the previous year?

 1. Property taxpayers in Minnesota have a right to equal treatment in the apportionment of the tax burden. *Hamm v. State*, 255 Minn. 64, 70, 95 N.W.2d 649, 654 (1959). A claim of unequal assessment may arise under the equal-protection clause of the United States Constitution, amendment XIV, the uniformity clause of the Minnesota Constitution, art. X, § 1, and under Minnesota Statutes sections 273.11 and 278.01, which require that all property be impartially, fairly and equally valued for tax purposes at its market value. Minn. Stat. §§ 273.11(1), 278.01 (1982). Unequal assessment occurs where a taxpayer's property is valued for tax purposes at a substantially higher percentage of its market value than is other property in the taxing district. *Hamm v. State*, 255 Minn. at 69, 95 N.W.2d at 654. *See* Note, Minne-

**2.** The tax court quoted the following language from the *Gamble* decision in its memorandum:

In order to determine whether or not Petitioner has been discriminated against, the Court must first determine what the average assessment/sales ratio is for all other property in the taxing district for each of the years

in issue and then compare that ratio with the subject property. * * * [T]he ratio to be applied to the subject property is the average assessment/sales ratio for all classes of property in the taxing district giving proper weight to the ratios derived from a study of the various classes of property.

sota Supreme Court 1980, 65 Minn.L.Rev. 1063, 1089 (1981); Note, Grounds and Procedures for Attacking Real Property Tax Assessments in Minnesota, 4 Wm. Mitchell L.Rev. 371, 392 (1978). Thus, a property may be assessed at or below 100 percent of its market value yet still be unfairly assessed relative to the assessment of other properties. The measure of relief upon a successful showing of unequal assessment is, in general terms, a reduced assessment reflecting the percentage level at which the other properties were valued. *In re McCannel* (to average ratio for other properties in same class in taxing district); *In re Dulton Realty, Inc. v. State,* 270 Minn. 1, 132 N.W.2d 394 (1964) (to level of most favored individual or group).

■■ In an action for unequal or discriminatory assessment, the burden of proof is on the petitioning taxpayer. We described the taxpayer's burden in showing unequal assessment in *Anacker v. County of Cottonwood,* 302 N.W.2d 342 (Minn. 1981), as follows:

"To determine whether a property has been unequally assessed," this court has recently stated, "its actual market value and real estate tax assessment must be compared with the market value and real estate tax assessments of other properties." *United National Corporation v. County of Hennepin,* 299 N.W.2d 73 at 76 (Minn.1980). Citing a number of decisions, we continued:

We view the above cases as holding in effect that a taxpayer will not meet the evidentiary burdens of establishing a violation of rights protected under the federal or state constitution, unless he can demonstrate that the disparity about which he complains resulted from the intentional or arbitrary or systematic undervaluation of other properties.

*Id.* at 76. Hence, it is not enough to show parcels near to each other, even if similar, were given different assessed values. It is not enough simply to compare these assessed values. Rather, the proportion the actual market value of

plaintiffs' parcel bears to its assessed value must be compared with the proportions these two values bear for other properties; these other properties must be within the same taxing district as plaintiffs' and it must be shown thereby that an arbitrary or systematic undervaluation of these other properties exists.

302 N.W.2d at 345. After *United National,* in order to prove lack of uniformity, a taxpayer need not demonstrate intentional discrimination, 299 N.W.2d at 75–76, 77, n. 5, but must prove a substantial disparity between the assessment ratio applicable to his or her property and that applicable to other properties in the same taxing district. No case to date has presented us with a sales ratio study adequate of itself to establish a *prima facie* case of unequal assessment under section 278.01. The petitioner in *United National* urged us to find that its private study of 38 commercial property sales in St. Louis Park between 1975 and 1977 established a *prima facie* case. We declined to do so, finding instead that:

(1) the number of instances examined as compared to the total number of assessed units of commercial property in the taxing district was not a sufficient sample to support reasonable inferences of unfairness or discrimination; (2) nothing in the study or supporting data underlying it disclosed the particular kinds of property involved or the terms and conditions of sale; * * *.

299 N.W.2d at 77. Likewise, in *In re McCannel,* we found market data on 10 sales of homes over $100,000 in McCannel's neighborhood that did not even indicate the year in which each sale took place to be insufficient evidence of the percentage of undervaluation. We remanded *In re McCannel* for evidence of the extent of undervaluation. 301 N.W.2d at 923. In *Anacker v. County of Cottonwood,* the taxpayer's private study failed because it did not show the actual market value of either the taxpayer's property or the property used for comparison. 302 N.W.2d at 345. There, we stated that "[i]nequality

cannot be demonstrated without figures for actual market values to compare with assessed values." *Id.*

In the cases before us, the taxpayers sought to prove their burden of showing unequal assessment on the basis of sales ratio studies prepared for the tax court by the Minnesota Department of Revenue for the years 1979 and 1980.[3] These studies serve to demonstrate the percentages at which properties are valued by the assessor compared to their actual market values.[4] The tax court in both cases accepted the studies into evidence, pursuant to Minn. Stat. § 278.05, subd. 4 (1982), took cognizance of them and applied them as each court saw fit and proper under the circumstances. The tax court in *Short* focused on whether the taxpayer's property had been discriminatorily assessed in comparison to other properties in the same class. *See, e.g., Renneke v. County of Brown,* 255 Minn. 244, 97 N.W.2d 377 (1959); *Hamm v. State.* The chief judge of the tax court in *3030 Drew* constructed an average assessment/sales ratio for all property, using the sales ratio studies provided by the Department of Revenue, then compared the resulting ratio with the actual market value and the assessed value of the taxpayer's property to find discriminatory assessment.

The issue before us is whether the sales ratio studies prepared for the tax court by the Department of Revenue may be used to establish a *prima facie* case of unequal assessment under section 278.01. We have not in the past, as previously noted, found sufficient evidence of unequal assessment when presented with questionable private sales ratio studies. *See, e.g., United National* (study of 38 commercial properties was incomplete and incorrectly assumed that sales price automatically equaled market value); *In re McCannel* (sample of 10 homes insufficient). In the cases before us, however, we are presented with sales ratio studies prepared for the tax court by the Minnesota Department of Revenue which included substantial data from all recorded sales of property in Hennepin County for the years 1979, 1980 and 1981.[5] The Department of Revenue has prepared studies of assessments for years to assure equitable distribution of educational and municipal aids based on the per-capita or per-pupil wealth of governmental subdivisions. Now, starting with the identical data used in its other studies, the Department of Revenue prepares studies for the tax court. The Department collects data from all recorded sales, makes an adjustment for personal property, screens out sales it deems unreliable, and compares the sales in a specific taxing district with the assessor's estimated values. The resulting ratio indicates the relationship between the selling prices of the properties sold and the assessor's market value. The tax court in *Short* said:

> lative mandate that property be assessed at full market value.
>
> Note, Grounds and Procedures for Attacking Real Property Tax Assessments in Minnesota, 4 Wm. Mitchell L.Rev. 371, 392 (1978). Permissible use of the ratio studies has undergone considerable legislative revision. Originally, ratio studies were not admissible to challenge assessments. In 1980, the legislature enacted legislation which in certain instances allows taxpayers to use the ratio studies as a *prima facie* basis upon which to request relief. Minn.Stat. § 278.-05, subd. 4–5 (1982).

3. The tax court in *3030 Drew* took judicial notice of the 1981 sales ratio study prepared by the Department of Revenue.

4. Assessment/sales ratio studies, which are compiled by the Minnesota Department of Revenue, have been described as follows:

 The * * * assessment/sales ratio is a ratio that compares the sales prices of recently sold * * * properties with the value given those properties for tax purposes. The ratio is designed to measure how close to market value the assessors are valuing property and the extent of inequality in assessment practices. For example, if the average assessment/sales ratio for [homesteaded properties in] a certain area is .80, this means that the homesteaded property in that area is on the average assessed at eighty percent of market value and therefore is not in compliance with the legis-

5. The 1980 sales ratio study alone contained data from 117 apartment sales in Minneapolis, 153 apartment sales in Hennepin County, and 8,501 sales of all types of property in Hennepin County.

Probably the best proof of unequal discriminatory practices are reliable sales ratio studies. * * * * The best any assessment/sales ratio study can do is indicate the approximate level of assessment within a taxing district. * * * * Assessment level refers to the overall ratio of assessor's values to the actual market value and the degree to which this ratio approximates the legally mandated ratio of 100%.

The data compiled by the Department of Revenue demonstrates that in Hennepin County there was substantial deviation from the full assessment requirement. Would it be proper to require the taxpayer to show why the substantial deviation occurred? We think not. Requiring a taxpayer to show what special methods in the assessment process caused the resulting substantial deviation might prove to be an insurmountable barrier. Each taxpayer should be required to pay only his or her proper share of the tax burden, regardless of what method caused the unequal assessments. *See Lerner Shops of Connecticut v. Town of Waterbury,* 151 Conn. 79, 87, 193 A.2d 472, 476–77 (1963) (it would be unreasonable and inequitable to deny relief to taxpayer who fails to sustain impossible burden of proving application of [discriminatory] uniform percentage when in fact there was no such application); *Tregor v. Board of Assessors of City of Boston,* 377 Mass. 602, 609, 387 N.E.2d 538, 542–43 (1979) (otherwise burden of proof on taxpayer imposes wasteful burden of proving assessed values and fair cash values of great number of properties other than his own). The legislature has provided that, as to homestead property owners, the ratio studies may be used as *prima facie* evidence of unequal assessment. Minn.Stat. §§ 278.01, subd. 2, 278.05, subd. 4–5 (1982). *Cf. Anacker v. County of Cottonwood,* 302 N.W.2d at 347 (county assessor's plan to equalize tax burden based on unadjusted Department of Revenue Assessment/Sales Ratio Study upheld). We have previously recognized that taxpayer relief sometimes is predicated on the availability of sound statistical data. *See United National,* 299

N.W.2d at 75–76. *See also* Note, The Minnesota Supreme Court 1980, 65 Minn.L. Rev. 1089, 1096 (1981) (substantial disparity standard requires "considerable reliance on sales ratio studies and attendant statistical testimony"). We also look to other jurisdictions which have for some time accepted state sales ratio studies as *prima facie* evidence of unequal assessment. *See, e.g., In re Appeals of Kents 2124 Atlantic Ave., Inc.,* 34 N.J. 21, 31–32, 166 A.2d 763, 769 (1961); *Tregor v. Board of Assessors of City of Boston,* 377 Mass. at 609, 387 N.E.2d at 542. We hold, therefore, that the sales ratio studies prepared by the Minnesota Department of Revenue may be used to establish a *prima facie* case of unequal assessment under section 278.01.

Relator Hennepin County does not question the admissibility or value of the "Assessment/Sales Ratio Study Analysis for the Minnesota Tax Court" but argues that these studies alone do not establish a *prima facie* case of unequal assessment where sales prices are not adjusted for the terms of the sale or the time the sale takes place. The use of the sales ratio studies by the taxpayer establishes only a *prima facie,* not an irrebuttable, case of discrimination. The burden of rebutting the validity of the studies is now on the taxing authority, which has the right to introduce evidence to rebut the taxpayer's claim. *See Deitch Co. v. Board of Property Assessment, Appeals & Review of Allegheny County,* 417 Pa. 213, 209 A.2d 397 (1965); *Ed Guth Realty, Inc. v. Gingold,* 34 N.Y.2d 440, 358 N.Y.S.2d 367, 315 N.E.2d 441 (1974). Any party may introduce evidence of the reliability or unreliability of the sales ratio studies. Minn.Stat. § 278.05, subd. 4 (1982 and Supp.1983). "The trier of facts may properly consider any weakness which may appear, as, for example, a paucity of sales in the [taxing district] concerned or some inbalance caused by unusual experience." *In re Appeals of Kents 2124 Atlantic Ave., Inc.,* 34 N.J. at 31, 166 A.2d at 768; *Ed Guth Realty, Inc. v. Gingold,* 34 N.Y.2d at 451,

358 N.Y.S.2d at 373, 315 N.E.2d at 445 ("The same questions then arise as would respecting any sort of proof; its weight and application are subject to judicial decision which can be reviewed on appeal."). The tax court judges in the two cases before us did take into account the terms of sales, timing disparities and other assessment evidence, and each made adjustments accordingly. The sales ratios as adjusted did not result in an automatic tax reduction. The taxpayers still had to establish the market value of their own properties and compare this and the properties' assessed market value with the level of assessment indicated by the adjusted sales ratios. On the basis of all of the evidence on the records before them, the tax courts properly made their determinations of unequal assessment.

▇ 2. The tax court in *3030 Drew* used a sales ratio derived from a comparison of all property of all classes within the taxing district or within the county in determining the claim of unequal assessment. Hennepin County argues that the comparison must be to the sales ratio of properties in the same class. *In re McCannel* remains good authority for the use of a sales ratio derived from a comparison of properties in the same class in determining unequal assessment in certain factual situations. 301 N.W.2d at 922. This was the measure of relief requested in *Short*. We believe it is within the discretion of the tax court, however, to use the sales ratio derived from a comparison of all properties in the taxing district.[6] This was the measure of relief requested in *3030 Drew*. The taxpayer has a right to request relief when his or her property has been "unequally assessed in comparison with *other property* in the city or county." Minn.Stat. § 278.01, subd. 1 (1982) (emphasis added).[7] We de-

termined in *Dulton Realty* that all property, whether in the same class, in the same taxing district or in different taxing districts, is to be treated alike for the purpose of discrimination analysis. *See* 270 Minn. at 15–17, 132 N.W.2d at 404–06. As the chief judge of the tax court pointed out, quoting that court's decision in *Gamble*,

> It is true that the legislature may decide to place a greater burden on certain classes of property by determining that certain classes of property are to be assessed at a higher percentage of the actual market value but the starting point for all classes of property must be the market value. In arriving at an estimated market value, the assessor may not employ a 100% ratio for commercial property and a 50% ratio for residential property and then apply the statutory ratio in order to arrive at the assessed valuation. To do so, would be an unconstitutional application of the statutory mandate.

The tax court not only used a sales ratio derived from a study consisting of all properties in all classes, it also gave weight to the ratios of each class in proportion to the dollar value of property within the City of Minneapolis, having found that the ratios for the City were very similar to those of Hennepin County for each class of property and for each year. The use of the weighted average ratio approach is within the expertise of the Minnesota Tax Court. *In re Appeals of Kents 2124 Atlantic Ave., Inc.*, 34 N.J. at 32, 166 A.2d at 769. We, like the New Jersey Supreme Court, realize that varying factual patterns do not lend themselves to a single rule for all cases. *Id.* at 30, 166 A.2d at 768. Therefore, we find no error.

▇ 3. We next consider whether the tax court in *3030 Drew* erred in taking

---

6. We note the amendment of Minn.Stat. § 278.-05, subd. 4, (1983 Supp.) by the 73rd Legislature, 1984 Minn.Sess.Law Serv. ch. 502, art. 11, § 5, but do not determine its effect on future decisions of the tax court.

7. *See Tregor v. Board of Assessors of City of Boston*, 377 Mass. at 608, 387 N.E.2d at 542, which stated:

> We think the aggrieved taxpayer may, if he chooses, claim an abatement of his assessment to the average percentage of fair cash value computed for the assessments of all taxable property in the taxing district. That remedy may be particularly appropriate when there is no apparent pattern in the disproportionate assessments (citations omitted).

judicial notice of the 1981 sales ratio studies prepared by the Department of Revenue. The tax court clearly notified the parties several times during the trial that it intended to take judicial notice of the studies. The tax court is not bound to follow the Minnesota Rules of Evidence. Rule XIV, Rules and Regulations of the Tax Court, Minn.Stat.Ann. ch. 271 Appendix, (West 1969, Supp.1983). We therefore find that the tax court did not err in taking judicial notice of the 1981 ratio studies where it clearly advised the parties in advance of its intent to do so.

■■■ 4. Lastly, we consider whether the tax court erred in finding the market value of the Short property in 1976 to be lower than the market value judicially determined for the previous year. In the memorandum accompanying its order, the tax court noted that during the period in question "there was a constantly rising market for rental real estate properties." Hennepin County claims that the tax court's lowering to $3,400,000 in 1976 from the judicially determined market value in 1975 of $3,600,000 is contrary to the court's "rising market" finding and therefore is in error. Hennepin County does not claim that the 1975 determination has a *res judicata* effect on the next year's assessment. Rather, the county argues that "there must be some relationship back and forward in determining value." Turning to the prior court determination, the trial court in *In re McCannel* found that the assessor had correctly valued Calhoun Towers at $3,600,000 in 1975. In the present matter, the tax court found the methodology of Short's expert to be more precise than the methodology of the assessor and adopted values very close to those claimed by Short. Thus, the assessor was affirmed in *In re McCannel*, while the taxpayer's valuation was adopted in *Short*. Assessments which require sophisticated financial estimates inherently contain subjective, independent judgments. The expert witnesses and the presiding judge in *Short* were completely different from those in *In re McCannel*. Given that new assessments are required periodically, and because the system allows various individuals to affect those assessments, it is implausible to expect complete consistency. The burden is on the taxpayer to show an excessive assessment. *In re McCannel*. The determination of whether the taxpayer has met this burden of establishing the true market value of property "rests with the trial court's resolution of the evidence and the weight and creditability of the testimony, including the opinions of expert witnesses." *In re Objections and Defenses to Real Property Taxes for the 1970 Assessment v. State*, 306 Minn. 184, 186–87, 235 N.W.2d 390, 392 (1975) (citations omitted). A tax court's valuation of property for tax purposes must be sustained upon review unless it is clearly erroneous in the sense that it is not reasonably supported by the evidence as a whole. *Hedberg & Sons Co. v. County of Hennepin*, 305 Minn. 80, 90, 232 N.W.2d 743, 749 (1975) ("clearly erroneous" requires court to hold definite and firm conviction that a mistake has been made). The tax court specifically took the judicially determined value into account. We find that the evidence as a whole supports the tax court's determination.

In the matter of *Short* and in the matter of *3030 Drew* we affirm the tax court in all regards.

Affirmed.

